1
2
3
4
5
6
7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

8

| UNITED STATES OF AMERICA, | Case No.: CR22-5070 BHS |
|---|---|
| Plaintiff, | |
| vs. | DEFENDANT'S SENTENCING MEMORANDUM |
| DUSTIN CARL WURGES, | SENTENCING: APRIL 29, 2024, 10:30 A.M. |
| Defendant, | |

COMES NOW the defendant, DUSTIN CARL WURGES, by and through his attorneys, Bryan G. Hershman & Scott T. McGinty, and respectfully presents the following memorandum in support of Mr. Wurges' plea for the mandatory minimum prison sentence of 120 months (60 months on Count 1 consecutive to 60 months on Count 2) following Mr. Wurges' guilty plea in the above captioned matter.

A.      **Summary of Sentencing**

Pursuant to a plea agreement with the government, Mr. Wurges pled guilty on October 13, 2023 to one count of Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. §924(c)(l(A)(i).

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

Mr. Wurges does not contest the Sentencing Guidelines calculation by the Probation Officer that includes, a two-level downward adjustment applied under USSG §3E1.1(a) because Mr. Wurges "clearly demonstrated acceptance of responsibility for the offense," and a one-level downward adjustment applied under USSG §3E1.1(b) because Mr. Wurges "assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to plead guilty.

However, Mr. Wurges *does* contest the calculation of his offender score by the Probation Officer at 4, because the probation officer has incorrectly assigned a point to Mr. Wurges' Federal Way Municipal Case involving an alleged no contact order violation. Pursuant to the Sentencing Guidelines, prior crimes are assigned points as follows:

> (a) Add **3** points for each prior sentence of imprisonment exceeding one year and one month.
> (b) Add **2** points for each prior sentence of imprisonment of at least sixty days not counted in (a).
> (c) Add **1** point for each prior sentence not counted in (a) or (b), up to a total of **4** points for this subsection.
> (d) Add **1** point for each prior sentence resulting from a conviction of a crime of violence that did not receive any points under (a), (b), or (c) above be-cause such sentence was treated as a single sentence, up to a total of **3** points for this subsection.
> (e) Add **1** point if the defendant (1) receives 7 or more points under subsections (a) through (d), and (2) committed the instant offense while under any criminal justice sentence, including probation, parole, supervised re-lease, imprisonment, work release, or escape status.

USSG §4A.1.1.

In the Federal Way matter, no sentence was imposed. The crime therefore does not fall under subsection (a) or (b). The crime was not a crime of violence, nor does Mr. Wurges have a criminal history score above 7, such that either subsections (d) or (e) would apply. This leaves only subsection (c), under which a point may be added for "a prior *sentence* not counted in (a)

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

or (b)…" USSG §4A.1.1(c). Again, no sentence was imposed in this case. Therefore, no point can be imposed under the plain language of the USSG.

The plea agreement specifies that the government will recommend a sentence of 120 months. The Probation Officer appears to endorse the guidelines range of four to five years of supervised release, the mandatory minimum for this case.

**B.    Section 3553(a) Factors.**

Congress has enacted a series of nine factors for the court to consider in fashioning an appropriate sentence for a defendant. Pursuant 18 U.S.C. 3553(a), the district court must "***impose a sentence sufficient, but not greater than necessary***" to comply with congressional directives. (Emphasis supplied.) While Ninth Circuit jurisprudence regarding the various sentencing principles the district courts should consider, case and each defendant must be considered individually based on the facts of the case.

The factors as applied to Mr. Wurges are:

(1)    The nature and circumstances of the offense and the history and characteristics of the defendant.

The nature and circumstances of the offense are sadly well known to the court. Mr. Wurges became entangled in a conspiracy to distribute large quantities of illegal substances, including fentanyl, methamphetamine, cocaine, and heroin into the community. As will be discussed herein, Mr. Wurges' judgment was significantly impaired by mental and physical health disorders and substance addiction. Although Mr. Wurges was in possession of a firearm, the firearms were found in a location that he shared with another co-defendant, and were found in bags within the vehicle Mr. Wurges occupied at the time of his arrest. They were not in Mr. Wurges' hands or on his body.

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

Also crucial in support of mitigation of his sentence in this matter is the fact that Mr. Wurges has expressed a deep sense of understanding of the harm his actions have caused as well as sincere remorse and regret. See Exhibit A – Dustin Wurges' Letter of Responsibility.

Dustin Wurges is currently 37 years of age. He is a citizen of the United States and has spent the vast majority of his life in Tacoma, Washington, and its environs, just north of the rest stop where he was arrested. More specifically, Mr. Wurges grew up in Fircrest and University Place, attending both University Place and Tacoma public schools. After graduating from Foss High School in 2005, Mr. Wurges moved in with his grandfather to nurse him through his final illness in 2007.

The move also allowed Mr. Wurges some reprieve from the abuse meted out by his father, Gareth Wurges, who was described by his son as a violent, angry alcoholic, a womanizer, and a "dirtbag." Mr. Wurges does not believe his father has ever been sober, despite his position as a police officer. Mr. Wurges' childhood home was anything but a safe haven. Mr. Wurges was beaten as a child, and his mother still suffers from ulcers brought on by the stress of her marriage. Mr. Wurges also believes that his father regularly beat his mother, but only personally witnessed one incident, as his parents usually sent him to his room when they argued. When Mr. Wurges was fifteen or sixteen, his parents became embroiled in an argument during which the elder Mr. Wurges grabbed his wife's arm, and his son punched him to protect his mother. Mr. Wurges never saw his father attack his mother after this incident.

Mr. Wurges' mother, Michelle Wurges, emotionally distanced herself from her husband and son when the younger Mr. Wurges was about 11. Mrs. Wurges remained in the marriage because she believed it would give her son the best possible life. She finally divorced Mr. Wurges' father when Mr. Wurges graduated high school.

DEFENDANT'S SENTENCING MEMORANDUM
Page 4 of 24

SCOTT T. MCGINTY
Attorney at Law
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

Mental illness, domestic violence, and addiction are heavily represented in Mr. Wurges' family. His grandfather returned from serving in Vietnam with PTSD and other mental illnesses. One of his mother's sisters is bi-polar; another is schizophrenic. Mr. Wurges reports that he was depressed and angry even as a child, and believes that the depression followed him into adulthood. He was sent to therapy in 6th Grade, but never evaluated for any mental illness. He refused to disclose the violence and abuse in his house, instead purposely presenting himself as a spoiled child who was angry because he wasn't getting his way.

Contrary to the picture painted for Mr. Wurges' therapist, he was being hit by his father regularly as punishment. The elder Mr. Wurges used belts and extension cords along with his hands to hit his son. Mr. Wurges often bore welts as a result of this abuse. Due to Mr. Wurges' active life as a child, he was seen at Mary Bridge at least once every summer for injuries. Although Mr. Wurges reports that many, but not all, of these visits were for injuries caused by his activities. Mr. Wurges reports that his father once hit him in the head so hard it caused his left eardrum to burst. Mr. Wurges believes that his doctors suspected child abuse, but he refused to confirm this. Other trusted adults in whom he confided shrugged off Mr. Wurges reports, apparently reluctant to believe a police officer would be an abusive parent.

Mr. Wurges' first contact with the criminal justice system occurred shortly after graduating high school, when a neighbor drove by Mr. Wurges and his friends playing "war" in a parking lot with Nerf guns. The neighbor called police to report that Mr. Wurges was in possession of a firearm and that he believed Mr. Wurges and his group were going to rob the store. Mr. Wurges was pulled over after leaving the parking lot, and immediately detained in handcuffs. Mr. Wurges' father arrived at the scene and, after a brief verbal altercation, punched his son in the face in front of all the officers at the scene. Mr. Wurges was then placed in a

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

patrol car while officers searched his vehicle. Marijuana was found in the car that belonged to Mr. Wurges' friend, who had placed his stash in Mr. Wurges' back seat prior to the boys commencing the Nerf gun war.

Mr. Wurges was charged with possession of an illegal substance with intent to deliver and, when his father appeared at arraignment and asked the judge to "teach Dustin a lesson," the judge obliged by setting bail at $10,000.00. Mr. Wurges was assigned a public defender, as his parents refused to hire counsel for him, and was later admitted to the drug court. Mr. Wurges met all the requirements of the drug court program, never missing a class or failing a drug test, and graduated from the program on time. See Attachment C – Motion and Order of Dismissal with Prejudice; Pierce County Superior Court Cause No.: 07-1-05243-9.

Mr. Wurges was an active child and athletic teen, playing basketball, baseball, and football at both Curtis and Foss High School. See Attachment D – Foss High School Football Roster. Due to his size and speed, he was recruited by colleges and frequently received letters from collegiate coaching staff members for both baseball and football, but elected to work and play baseball at Tacoma Community college after graduating high school. It is important to note that due to his active lifestyle, Mr. Wurges suffered numerous concussions while growing up, many of these as part of playing football.

While attending community college, Mr. Wurges worked various jobs, including at Les Schwab Tires, a brief stint with the City of Tacoma, and as a car salesman at several different used car lots. It was in car sales that Mr. Wurges found the most job satisfaction. He began his career during his brief enrollment at Tacoma Community College, moving, washing, and picking up cars. Mr. Wurges eventually got a job selling cars at Cars R Us, and he dropped out

SCOTT T. MCGINTY
Attorney at Law
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

of Tacoma Community College to pursue this job path. Mr. Wurges sold cars at various lots in the City of Tacoma for the next 10 years.

It was during this decade that Mr. Wurges was also involved in a car accident that would change the course of his life. In December 2013, Mr. Wurges was hit head-on when another vehicle crossed the double yellow line on S. 72nd Avenue to go around a slower moving vehicle. The other car crashed into Mr. Wurges' SUV at 42 mph. Despite wearing his seat belt, Mr. Wurges' back was crushed, with damage to his L5 vertebra and his S1 disc. Mr. Wurges was concussed and suffered cuts and contusions as a result of the accident as well.

After Mr. Wurges was released from the hospital, he attempted physical therapy and chiropractic treatment, but was ultimately referred to a surgeon. Following the surgery to his lower back, Mr. Wurges continued to treat with a chiropractor, but nothing worked to either correct his posture or stem the pain and he was referred to a pain management physician in Puyallup, who prescribed Oxycontin for his pain. This turned out to be the beginning of Mr. Wurges' drug addiction.

Soon after, Mr. Wurges was admitted to the hospital with uncontrollable pain. Tests revealed that his sciatic nerve was pinched, causing severe back spasms, and a second surgery to correct the issue was recommended. Hydromorphone was prescribed after Mr. Wurges' surgery. Unable to work, Mr. Wurges stayed with family and friends while his daughter and her mother moved in with the material grandmother.

By the following year, Mr. Wurges was entirely addicted to opioids. When the prescribed dosage of Hydromorphone stopped working to control his pain, Mr. Wurges bought oxycontin on the street. Mr. Wurges disclosed his concerns of becoming opioid dependent, but the attempts of his Physician to wean him off the pain medications were unsuccessful due to

SCOTT T. MCGINTY
Attorney at Law
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

Mr. Wurges' high pain levels. Ignoring his obvious addiction, Doctors simply told Mr. Wurges that he had to exercise and work through the pain and provided no other assistance. Eventually Mr. Wurges was able to return to work as a used car salesman, making enough money to support his drug addiction, which in turn sufficiently controlled his pain throughout the workday.

When his friend Jacob Korum was released from jail, Mr. Wurges went to work for him at the newly launched South Tacoma Motors. However, Mr. Wurges' addiction continued to deepen, and he left the dealership during a period of significant growth for the business, as his addiction was now sufficiently severe that he was unable to perform his work in a satisfactory manner.

While Mr. Wurges and his girlfriend were able to secure an apartment at S 74th and Pacific Avenue with their daughter, Mr. Wurges understood that without a constant income stream, what little progress he had made since his surgery would be lost. It was at this time that Mr. Wurges began to work for meat sales and delivery company Steak House as a regional sales manager, providing him with a lucrative – and daily – income stream.

It was during this time that Mr. Wurges began taking 30 mg Percocet pills when Oxycontin ceased manufacturing. These he found he could purchase on the street or through prescriptions easily obtained from walk in clinics, allowing him to support his 3-4 pill a day habit. Mr. Wurges also graduated from swallowing to snorting the pills during this time frame.

In 2016, Mr. Wurges met co-defendant Jonathan Mayhall through a friend, and began to purchase heroin through Mr. Mayhall when the price of Percocet became prohibitive. Both he and his girlfriend became addicted to this drug, which Mr. Wurges reported gave him a longer high than Percocet, in addition to being less expensive. Within months, the couple's daughter

SCOTT T. MCGINTY
Attorney at Law
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

was living with her grandmother and Mr. Wurges and his girlfriend were residing in a Fife motel. In 2017, Mr. Wurges was arrested and charged with multiple non-violent felony counts in three different cases, all of which were eventually consolidated. He would eventually plead guilty in exchange for a prison-based Drug Offender Sentencing Alternative (DOSA) in Pierce County. Mr. Wurges served a total of 31 months in custody on the DOSA sentence between Airway Heights, the camp in Walla Walla, and work release, incurring no infractions in either prison. However, Mr. Wurges also did not receive the promised 12 weeks of intensive treatment and education about addiction and its mental, emotional, and relational effects that was promised under the DOSA program. The counselor running the program was eventually terminated by DOC. It was only in the final month of Mr. Wurges' prison-based DOSA program that DOC engaged a corrections officer who offered a substantive abuse treatment program. Mr. Wurges attended sessions, completed assignments, and developed a rapport with his counselor.

Mr. Wurges was released to the Progress House in Tacoma for the work release portion of his sentence. He received minimal treatment through the Consejo Treatment Center, receiving two packets of material a week and attending a single class sheet despite only attending the first ten minutes of Sunday's classes. To compound matters, supervision at Progress House was so lax that a fellow resident within the facility ended up overdosing in the following days. After this event, a full sweep of the facility was conducted and everyone at Progress House was rounded up and return to the prison in Shelton, where Mr. Wurges had to contend the revocation of his DOSA. The hearing officer docked Mr. Wurges 20 days of good time and set him up for his release from prison. However, DOC headquarters was displeased with the hearing officer's decision and, after receiving communication from Consejo Treatment

SCOTT T. MCGINTY
Attorney at Law
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

Center claiming that Mr. Wurges had been discharged from treatment because they needed the bed space, continued to seek revocation of Mr. Wurges' DOSA. Mr. Wurges successfully preserved his DOSA for a second time and completed the in-custody portion of his sentence.

Mr. Wurges was released on March 22, 2020 from prison; he was dropped off at the Greyhound Station with $40 in his pocket. He reported to the clean and sober house that had been approved by DOC only to be denied admittance due to COVID. DOC's response was to tell Mr. Wurges to go to a shelter and figure it out. Mr. Wurges spent the following weeks couch surfing with various friends, going to meetings, and regrettably stealing food from Safeway so he could eat.

The following month, Mr. Wurges was able to leverage his friendship with the owner of a local landscaping business to obtain employment. Despite being paid in cash daily, Mr. Wurges did not use the money for drugs, electing to remain sober. Recalling that time, Mr. Wurges stated that he "just did not want to get high anymore." Mr. Wurges started saving money and purchased equipment to start his own company, Wurges Cleaning and Landscaping, LLC, in June 2020, which he operated on weekends, and in addition to his weekday job.

During this time, Mr. Wurges was also able to develop a rapport with the apartment manager working at the building where his new girlfriend, Dylan Lavitz, lived, and was able to move in full time. Shortly after Mr. Wurges and Ms. Lavitz married in August 2020, his bride, also a drug addict, soon relapsed after a friend came to visit. Mr. Wurges told his wife that he would leave if she did not get sober. Ms. Lavitz entered a substance abuse program and the two worked on their relationship, but his wife continued to use, and to steal money to support her habit. Mr. Wurges, who had remained sober during this period, left the marriage in January 2021.

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

Sober and driven, Mr. Wurges continued to grow his landscaping and cleaning company throughout 2021. Mr. Wurges met Tacoma Municipal Court Judge Ladenburg's wife, Diane Ladenburg, at a client's house, and was soon hired to work at an apartment complex the couple owned in Puyallup. Mrs. Ladenburg arranged for Mr. Wurges to move into one of the apartments, where he maintained the grounds, collected rent, and was entrusted with the keys to various units. See Attachment E – Letter from Diane Ladenburg. It was during this time that Mr. Wurges met his current girlfriend, Alixzandria DeWitt. This was a memorable time for Mr. Wurges, as he stayed in compliance with his probation, remained sober, and matured a good relationship with Ms. DeWitt, her son, and his own daughter. For the first time, Mr. Wurges was truly happy and prospering in a world absent of drugs, fear, and chaos. He had attained financial stability, and together, he and Ms. DeWitt, fostered the warm and safe home that he had always longed for.

Mr. Wurges appeared to have left his turbulent past behind him. Sadly, he collapsed at work and was rushed to the hospital. It was later determined that Mr. Wurges had a severe blood clot caused by varicose veins, which may have killed him had he not been within a few miles of the emergency room. When he awakened to realize Doctors had administered opiates while Mr. Wurges was still unconscious, he immediately told his doctors that he was an addict and could not have opiates. These doctors listened, but others would not.

In May 2021, Mr. Wurges was referred to a vascular specialist to treat his severe, hereditary varicose veins. See Attachment F – MultiCare Records. Despite Mr. Wurges disclosing that he was an addict, the doctor prescribed Vicodin for pain relief after stripping the veins from one of Mr. Wurges' legs. Ms. DeWitt called the doctor's office when she learned Mr. Wurges had come home with narcotics, and was told that he needed the medicine for the

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

post-operative pain and that the office would work with him to wean him from the medication after he had healed.

Predictably, however, Mr. Wurges' depression and pain remained after his two-week supply of Vicodin ran out and Mr. Wurges relapsed with fentanyl when the Doctors did not respond to his distresses. After Ms. DeWitt caught him using, Mr. Wurges reported his relapse to his treatment center, and DOC sanctioned Mr. Wurges with an extra NA/AA meeting per week while threatening to revoke his DOSA and impose imprisonment if he continued to use. Despite the methadone treatment he was receiving from his treatment provider, Mr. Wurges continued to use fentanyl and heroin, and was purchasing these narcotics from his former drug dealer, Mr. Mayhall.

Mr. Wurges reported to the hospital for varicose vein surgery on his other leg, but the surgeon did not perform the surgery properly, opening Mr. Wurges' thigh with an 8-inch incision through which she removed his veins, rather than removing them one at a time with several small incisions. The large incision caused a substantial amount of blood loss after surgery, and Mr. Wurges was again prescribed narcotic pain relief.

At his final post-operative appointment with his surgeon two weeks later, Mr. Wurges disclosed that he was dependent on narcotics, unable to work or even get in and out of his car due to the large incision in his thigh. The surgeon responded to his concerns by ordering Mr. Wurges and Ms. DeWitt out of the building, telling them that she had done "everything you asked me to do," despite the fact that she had caused nerve damage in his leg, had failed to remove all of the varicose veins, and had inflicted a far larger than necessary incision on his leg.

//

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

After this surgery, Mr. Wurges became more embroiled in his addiction and would frequently visit Mr. Mayhall to purchase fentanyl. To conceal his addiction from Ms. DeWitt, Mr. Wurges would never bring drugs into their home, and would purchase and use fentanyl in motel rooms while his family assumed he was at work. Unfortunately, Mr. Wurges was able to remain financially stable and had employees who could accomplish the work on behalf of the company. Although Mr. Wurges was spending more time with his drug dealer than his own family, he continued with his methadone usage and attendance at treatment even while continuing to use.[1]

Aware of Mr. Wurges' financial successes, Mr. Mayhall persuaded Mr. Wurges to fund a large purchase of various drugs from a new source in Anaheim. According to Mr. Mayahll, the prices and quantities offered by this source were far less expensive than his current supplier, and in return for his investment, Mr. Wurges would receive a portion of the profit and an abundant supply of fentanyl. Fearing that Ms. DeWitt would become suspicious of this trip to Anaheim, Mr. Wurges was hesitant to join Mr. Mayhall. However, Mr. Wurges also did not trust leaving such a large sum of cash with his drug dealer and agreed to a travel to Anaheim to purchase the drugs with Mr. Mayhall. Unbeknownst to him, Mr. Mayhall was being tracked by federal agents, and was subsequently arrested at a rest stop just south of Olympia. Mr. Wurges was arrested solely due to his presence in the car; agents did not even know Mr. Wurges existed until finding him in the vehicle.

Mr. Wurges was held at the Thurston County Jail pending filing of charges. During this time, he requested methadone over 20 times from jail staff. He was given only vitamin juice

---

[1] Because fentanyl does not show up on a urinalysis unless specific testing is ordered, Mr. Wurges continued to pass his drug tests. He also had prior notice of the tests and could refrain from smoking methamphetamines long enough to pass a drug screen.

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

packs to deal with the withdrawals. It would be four days before medical staff advised him that he was not a patient at the Thurston County Clinic. Mr. Wurges had to explain yet again that he was a patient at a clinic in Pierce County, and provide the name of the clinic again as well. Ms. DeWitt also called the Pierce County clinic on his behalf. Mr. Wurges had been in jail – and in withdrawal – for a full week before he was able to speak to someone at the clinic where he was then a patient. He was told that because he had been off of methadone for seven days, he needed to be evaluated by a doctor before he could be put back on the drug. Mr. Wurges was seen by a mental health professional, who prescribed trazadone, which Mr. Wurges refused to take after a bad reaction to the drug, and attempted to prescribed a psychotropic drug which Mr. Wurges refused.

In the meantime, Thurston County refused to have a doctor evaluate Mr. Wurges for a methadone prescription, and he remained in withdrawal for weeks, until he was indicted and brought to the federal detention center, where he is now incarcerated.

The Probation Officer scored his experiences on the Adverse Childhood Experiences (ACEs) questionnaire, where Mr. Wurges scored at 7, only three points short of the highest possible score. Mr. Wurges told the Probation Officer that "he was physically and emotionally abused, did not feel loved or special, his parents were divorced, he saw his mother abused, he lived with a person dealing with mental health problems and he lived with a person who was an alcoholic." ACEs scores correlate with a likelihood of mental health and behavior problems into adulthood. This assessment gives further credence to Mr. Wurges' problems staying with a single job, and his relapses into drug addiction to deal with physical pain when other solutions were not readily available.

SCOTT T. MCGINTY
Attorney at Law
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

Mr. Wurges' medical providers not only did nothing to support his sobriety, but they actively undermined it by continuing to prescribe narcotics for pain management, utterly failing to provide other forms of medication or therapy that would help him in managing his pain without opioids.

In sum, Mr. Wurges asks the court to consider his traumatic childhood, mental health and substance abuse disorders in determining his sentence. It not necessarily the length of his prison term that will help Mr. Wurges deal with his problems in a healthy and productive way, but rather the rehabilitating programs and recourses that are made available to him during this time.

**Accomplishments**

While awaiting the resolution of his 2017 felonies in the Pierce County Jail, Mr. Wurges became the first inmate to complete the Thinking for a Change course sponsored by the Pierce County Alliance. Thinking for a Change is a 25-30 session program led by trained corrections professionals that employs cognitive behavioral therapy to improve offender social skills, problem solving, critical reasoning, moral reasoning, cognitive style, self-control, impulse management, and self-efficacy.[1]

In addition, Mr. Wurges has demonstrated an active commitment to sobriety that would not have been interrupted but for the actions of his doctors. Despite surviving several triggering events after his release on his 2017 charges, Mr. Wurges did not relapse at that time. It has been established that addicts are likely to relapse when they get too hungry, angry, lonely, or tired (HALT). Based on this, we can determine that the way Mr. Wurges was released from prison in 2020 – only $40 to his name, no housing, and no other support – was

---

[1] Thinking for a Change 4.0 | National Institute of Corrections (nicic.gov)

SCOTT T. MCGINTY
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

clearly a triggering event. Even in the face of these triggers, and despite the failure of the DOSA program to provide substantive treatment, Mr. Wurges remained clean and sober. He further demonstrated his commitment to sobriety by attendance at 4 to 5 NA/AA meetings a week until public meetings were shut down due to the COVID pandemic. He also sought out other clean and sober people, including his fiancée, Ms. DeWitt, and avoided people who, like his ex-wife Ms. Lavitz, were or would become threats to his sobriety. Mr. Wurges founded a successful cleaning and maintenance business that allowed him not only to support his fiancée and their children, but to employ other formerly convicted people and recovering addicts. His dedication to turning his life around attracted and secured the support of prominent community members such as Diane and David Ladenburg.

The disheartening apparency is that Mr. Wurges would not be before this court if he had not needed surgery for severe varicose veins.  Likewise, if medical staff had not overlooked Mr. Wurges' addiction and afforded him the alternatives to narcotic pain relief that he had clearly requested, Mr. Wurges sobriety would not have been compromised. In truth, Mr. Wurges' sobriety was not interrupted by narcotics that he had purchased from a drug dealer, but rather from the opioids that were prescribed to him by his doctor.

Mr. Wurges has not incurred any infractions while imprisoned, including his most recent incarceration at the FDC which commenced March 23, 2022. He likewise has not failed a single drug test, and is the chair of a 12-step meeting every Tuesday within the facility. He has also worked as the Head Orderly in his unit. Orderlies are chosen based on their rapport with Custody Officers and with their counselors. Mr. Wurges also holds the paying position of Recreation Aide, where he assists in organizing activities for his unit and leads a workout class that meets every weekday for 90 minutes. He has also frequently been tapped by his Counselor,

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

Mr. Joyce, to meet with representatives of racial groups within his unit to discuss racial problems and evaluate offenses and threat levels of inmates when groups seek movement of certain inmates to another unit. Finally, Mr. Wurges completed Health and Nutrition Training on October 16, 2022 while in the FDC. *See, Certificate of Completion,* Exhibit G.

(2)   The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The court is likely aware of the conditions of the Federal Detention Center (FDC) where Mr. Wurges is incarcerated. See Exhibit H – FDC SeaTac Bulletin.  When Mr. Wurges arrived at FDC he told the medical staff that he is on the methadone program and an addict. No methadone was provided, or has been provided, since Mr. Wurges commenced his incarceration at FDC. For the first two weeks of federal detention, Mr. Wurges could barely eat, and was unable to hold down any food that he did consume. He suffered with diarrhea, cold sweats, and inability to sleep for over five weeks after he was booked into the FDC. Mr. Wurges currently takes ibuprofen for pain and receives sublocade shots to help him with his opioid addiction. He has been prescribed a blood thinner due to the blood clot that almost killed him, but these medications have not been steadily administered.   See Exhibit I – BOP Treatment Records.

Professional addiction treatment and pain management treatment is vital to Mr. Wurges' ability to manage his life and his incarceration for the indefinite future, if not for the rest of his life. Mr. Wurges recognizes the harm he caused himself through attempts to self-medicate to control his pain, even though his relapse into addiction was essentially fueled by his physicians. Mr. Wurges also acknowledges that he needs continuous appropriate treatment to thrive and

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

succeed. Failure to obtain adequate medical treatment, for both pain management and addiction, will only serve to make his transition back into the community more challenging. Whether he will receive the necessary care and treatment in custody is questionable at best.

Mr. Wurges is also looking for opportunities to further his education and to gain additional marketable skills to help him secure gainful employment upon his release. His employment history has been varied and people orientated so vocational training in those areas would be most beneficial.

(3)     The kinds of sentences available.

The Sentencing Guidelines provide only for a sentence of incarceration.

(4)     The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission that are in effect on the date the defendant is sentenced.

Mr. Wurges is subject to a five-year mandatory minimum sentence on each of the two counts. 21 U.S.C. §841(b)(1)(B), U.S.C. §924(c)(1)(A)(i). Pursuant to U.S.C. §924(c)(1)(A)(i), the terms are to be served consecutively.

(5)     Any pertinent policy statement issued by the Sentencing Commission

The defense is unaware of any relevant policy statements from the Sentencing Commission.  However, United States Attorney General Merrick Garland on December 16, 2022 issued a policy memo providing "additional, specific policies regarding charging, pleas, and sentencing in drug cases – consistent with the priority the Department has placed on focusing its prosecutorial resources on combatting violent crime." *AG Memo,* attached as Exhibit J.  Of particular note is the fact that the Attorney General cautions that charges that subject a defendant to a mandatory minimum sentence

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

should ordinarily be reserved for instances in which the remaining charges ... would not sufficiently reflect the seriousness of the defendant's criminal conduct, danger to the community, harm to victims" and "such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation.

Ex. J at 1, *citing* General Policies Memorandum at 2, 3.

The policy statement cautions that in drug cases brought under Title 21 USC, mandatory minimum sentences have "resulted in disproportionately severe sentences for certain defendants and perceived and actual racial disparities in the criminal justice system." *Id.* Thus, the policy statement encourages prosecutors to "decline to charge the quantity necessary to trigger a mandatory minimum sentence" provided the defendant satisfies certain criteria:

- The defendant's relevant conduct does not involve: the use of violence, the direction to another to use violence, the credible threat of violence, the possession of a weapon, the trafficking of drugs to or with minors, or the death or serious bodily injury of any person;
- The defendant does not have a significant managerial role in the trafficking of significant quantities of drugs;
- The defendant does not have significant ties to a large-scale criminal organization or cartel, or to a violent gang; and
- The defendant does not have a significant history of criminal activity that involved the use or threat of violence, personal involvement on multiple occasions in the distribution of significant quantities of illegal drugs, or possession of illegal firearms.

Ex. J, at 2.

Mr. Wurges meets nearly all the criteria set forth in the Attorney General's memorandum: the conduct here did not involve violence or threats of violence, death or serious bodily injury, or trafficking to minors. Mr. Wurges did not play a "significant managerial role" in the drug sales operation, does not have significant ties to any large-scale criminal organization, cartel, or violent gang, and has no violent criminal history. The only criteria not satisfied is the fact that Mr. Wurges was in possession of a firearm when he was arrested. However, it is crucial to note that the weapon was in the vehicle, and was not worn

SCOTT T. MCGINTY
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

by Mr. Wurges, and there is no claim that Mr. Wurges ever reached for, let alone brandished, the weapon at any time during this or any other criminal activity.

Further, Mr. Wurges' only felony history consists of low-level felonies committed in Pierce County in 2017. Mr. Wurges is clearly not a career criminal. He has likewise demonstrated that he is determined to remain sober and has committed himself to a path of success and sobriety. It is important to note that Mr. Wurges' entire felony history consists of crimes alleged to have been committed within a short 96-day period. Prior to April 2017, Mr. Wurges had no felony convictions. His status in the FDC as well as his complete lack of any violations speaks to his commitment to forging a better life, whether in or out of prison.

(6)    The need to avoid unwarranted sentence disparities among defendants

Mr. Wurges has one co-defendant, Jonathan Mayhall. Mr. Mayhall was sentenced to 120 months in March 2024. While the government has refused to see Mr. Wurges role in the immediate case as relatively minor; it was Mr. Mayhall who was the primary target of the investigation and who "used his criminal contacts to arrange a drug deal." *See Jonathan Mayhall's Plea Agreement.* Unlike Mr. Wurges, Mr. Mayhall is a convicted drug dealer, who was observed by law enforcement making multiple dealings, to include the sale of 2,000 fentanyl pills just hours before the defendants were arrested. Finally, the Government sought a two-level enhancement at Mr. Mayhall's sentencing for his attempts to willfully obstruct or impede the admiration of justice for instructed his sister to wipe his cellular devices.

(7)    The need to provide restitution to any victims of the offense.

No restitution is sought.

//

/

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

## C. Overrepresentation of Criminal History Category.

Generally, a high criminal history score describes someone who has a lifelong criminal history. U.S.S.G. §4A1.3(b)(1) provides for a downward departure if the criminal history "substantially over-represents the seriousness of the defendant's criminal history…" Here, the criminal history that may be counted towards Mr. Wurges' offender score consists of three felony charges that resolved under a single sentence. These crimes, including residential burglary, theft of a firearm, and possession charges, which were plainly a product of Mr. Wurges' addiction. None were violent; all were passive and did not endanger anyone. While a reduction in the offense level will not change the mandatory minimum of 120 months, this information is analogous to the instant matter, as these prior convictions occurred shortly after Mr. Wurges was first introduced to prescription drugs, in this case, opioids.

## D. Adjustment to supervision

As noted *supra,* Mr. Wurges underwent two unsuccessful varicose veins surgeries on his legs in 2021, causing Mr. Wurges complications that included extreme pain. On October 19, 2021, Mr. Wurges was in the hospital, as Ms. DeWitt advised his DOC Field Officer when he called. A warrant was nevertheless issued when Mr. Wurges was unable to return the Field Officer's call. Thereafter, Mr. Wurges saw his treatment provider and advised her that he would fail a drug test for opioids, as he had been prescribed Oxycodone. This was the active DOC warrant Lew enforcement found when identifying Mr. Wurges on the date of his arrest. Accordingly, this single violation on October 19, 2021, occurred while Mr. Wurges was hospitalized and prescribed narcotic pain medications. It should be noted that Mr. Wurges was in perfect compliance with DOC and "completed all requirements for his DOSA" before being prescribed opioids to recover from a botched surgery. See Exhibit K- DOC Preparation Sheet.

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

### E. Time Served

Mr. Wurges was arrested on November 8, 2021 in this case. While he was initially held in the Thurston County Jail, the delay in transferring the case to the FDC was due to COVID, which not only affected incarcerations, but the federal government's ability to secure indictments, as it was unable to present cases to a grand jury. Thurston County took no action on this case while Mr. Wurges was in their custody, as they were aware from the date of the arrest that Mr. Wurges would be transferred to federal custody. Accordingly, Mr. Wurges should be granted credit for time served for the 135-day period between November 8, 2021 and March 23, 2022, in addition to credit for time served while incarcerated at the FDC.

### F. Mandatory Minimum Sentence

The defense endorses the Probation Officer's assessment that "Mr. Wurges' drug addiction and turbulent upbringing may be reasons to consider a variance in this case." The defense would further reiterate that the most recent relapse, which led to the charges in this case, was brought upon by a physicians' poor handling of his post-operative pain management. While this does not excuse the commission of criminal actions, as Mr. Wurges affirms in his letter to the court, it does provide an explanation and framework for mitigation of the consequences of those actions.

In addition to the factors argued *supra,* it should be noted that, if Mr. Wurges is scored at a 3, he would have been 18 US 353(f)/First Step eligible under the guidelines set forth by the dissent in *Pulsifer v. United States,* 218 L. Ed. 2d 77, 144 S. Ct. 718 (March 15, 2024). Under the First Sep Act, a defendant must satisfy five stringent statutory tests, only the first of which was at issue in *Pulsifer.* There, the majority opinion adopted the government's argument that a defendant may be eligible for individualized sentencing – rather than subject to a mandatory

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

minimum sentence – if he or she "does not have" *any* of the three traits outlined in the first statutory test of the act: "(A) more than 4 criminal history points, (B) a 3-point offense, and (C) a 2-point violent offense." *Id citing* 18 U.S.C. 353(f)(1). The dissent would have sided with Mr. Pulsifer, who argued that the Act most naturally reads, as the government even conceded, that a defendant is eligible for individualized sentencing unless he or she possessed all three traits listed in subsection f, rather than barring individualized sentencing unless the defendant in fact *lacked all three traits. Id* at 101.

Other than the three Pierce County Superior Court cases, all of which are a part of a single prison-based DOSA, Mr. Wurges has no felony history. He would possess only item (B) on the First Step Act's first statutory test – having a 3-point offense on his record. But, because the Court imposed a tortured construction of the Act to severely limit its applicability, Mr. Wurges, like Mr. Pulsifer, is not eligible for an individualized sentence under this statute, although the district court may still impose a sentence departing downward from the mandatory minimum based on other considerations.

## G.    RDAP Recommendation

Even if Mr. Wurges is not granted a sentence reduction, he would like a recommendation for RDAP.

## H.    Conclusion

Defendant Dustin Wurges respectfully requests the court to sentence him to the mandatory minimum sentence of 120 months in prison, four years of supervised release, and to consider fashioning an appropriate sentence, that includes a recommendation for RDAP.

///

//

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

Respectfully submitted this ___22nd___ day of April, 2024.

_Scott McGinty_
Scott T. McGinty, WSBA #57054
Attorney for Defendant

**SCOTT T. MCGINTY**
**Attorney at Law**
1105 Tacoma Ave South
Tacoma, Washington 98402
Telephone: (253) 691-0530
Email: s.mcgintylaw@gmail.com

EXHIBIT A

To the Honorable Judge,

I am writing this letter to formally express my deepest apologies for my actions and the subsequent repercussions they have caused within this community, my family, and myself. I stand before you, not only as an individual who has erred greatly but as someone who has gained a profound understanding of the gravity of the destructive choices I have made. To say I regret the choices that have put me before your Honor would be an incredible understatement, as I now struggle to find the appropriate words to express the overwhelming shame I will be saddled with for the remaining years of life. Although I have wrote, rewrote, and wrote this letter again and again, I have come to the realization that neither my words, tears, nor confessions will ever mend the pain I have inflicted upon those I love. Please know that I am not seeking forgiveness at this juncture, as I have only begun my journey to someday earn that from your Honor, my family, and community. The confessions herein will not only serve as a reminder to myself of the harm that I have caused, but also to pain and grief I have inflicted upon myself. Although I will stand before you an ashamed man in a detention uniform, I am miles from the broken, mislead, and selfish person who once occupied my body. For these reasons, I will always keep this letter in remembrance to the anguish I have caused and the drowning shame that I may never escape from.

I would first like to acknowledge that maturity is not simply a function of age. I did not truly grow up when I turned 18; I merely aged. My true growth began when I embraced sobriety. It has been said by many that addiction is a choice, but I have come to learn through a painful journey that it is a complex interplay of social and biological factors that require a robust combination of support and medication to overcome. For too long, I mistook addiction for a choice, not realizing the intricate challenges it presented. My addiction took me into a darkness and blinded me from the simple joys in life that I squandered, such as the comfort of coming home after a long honest day of work to my children embracing me with a hug as I step through the door. While today I can only cherish and long for these indescribable simplicities of life, I am mortified to admit that I allowed an addiction, I once overcame, to again eclipse my character, poison my body, and thwart me from fulfilling my obligations as a father, citizen, and husband. I have heard that "time heals all wounds," but I am not so sure that is completely true. Since admitting complete defeat to my addiction, the pain of regret and humiliation has only intensified with every passing day. Yet, by conceding to this pain I am also experiencing some serenity in my life for the first time, as I am now eager to find the strength and wisdom to overcome my addiction. Through self-reflection, mediation, and group counseling, I am acquiring the skills to stimulate sobriety by channeling my fear of succumbing to addiction rather than allowing it to remain a dormant burden. To put it simply, my addiction is not a disease that I can treat on my own and I would greatly appreciate the opportunity to continue this path with professional treatment providers and likeminded individuals.

In the eyes of my family, I hope for redemption. I hope they have found it within their hearts to forgive my shortcomings, my ill decisions, and my character flaws. They now witness a man, once lost, striving to progress, armed with the best information and intentions to be the best version of myself. My heart is heavy with the fear that my actions might have cast a long shadow over my children's lives, potentially predisposing them to the same struggles with addiction. The thought of them turning to substances to numb the pain of a childhood marred by my actions is a prospect more terrifying to me than any other. The anxieties I have for my children is prevalent, as I cannot be there to protect my daughter, Addyson and my son, Jeremiah from the perils that frequently lurk in the environment that has been compelled from my actions. At this time, I am uncertain that whether I will ever be able to forgive myself of this.

The toll of my addiction and actions has been catastrophic. However, it is not the loss of two businesses and a home that is tragic, rather it is the forfeiture of the time away from the presence of my children and wife. The repercussions extended to my wife's career with the Department of Corrections and resulted in the removal of my son from our home for a year. I failed to uphold my responsibilities as a a father to provide a loving home for my family to prosper within. I must live with the fact that it was my choices and actions that deprived my family of a beautiful home. There are simply no words to express the morbid shame of failing as a father and husband.

My shame spreads beyond my wife and children, having brought embarrassment to my father, grandparents, aunts, and uncles. The relationships with my mother and my entire support network have been severed. I have found myself in such despair that I considered ending my own life. If not for the hope of someday validating my true character to my family and community, I may have made my last and final selfish decision. Still, I refuse to allow my children to remember me as the man they once visited in a Federal Detention Center, and if blessed with the opportunity to be present during their final days of adolescence, I will strip myself of any selfishness and devote myself to my children and their future. In the absence of addiction, I know this is possible but not promised. Again, I do not deserve forgiveness, but I believe that I have a debt to repay to my family and the community that raised me. Though this debt could never be satisfied, I will never cease my efforts of one day achieving the impossible goal of forgiveness. This is promise.

I believe it is important for your Honor to know that I was born and raised in Tacoma. This is of significance because my actions have not only harmed those close to me but have also afflicted the community I hold dear. The ripple effect of my choices has touched men, women, and children, impacting local fire and police departments, hospitals, churches, and businesses, ultimately bearing down on the local economy, government, and educational systems. Today, I see Tacoma as an individual. An incident individual, who did not deserve an ounce of the pain I afflicted. This city provided me fields and parks to play baseball and football in, a waterfront to enjoy, and schools filled with teachers who sincerely cared for me. Tacoma deserved better. For this widespread pain, I am truly, deeply sorry.

I stand before you today, Your Honor, as someone who has recognized his transgressions and who is committed to making amends. I am resolved to take responsibility for my past actions and to contribute positively to society. I plead for your leniency and for an opportunity to prove that I am more than the sum of my past mistakes.

With the utmost respect and humility,

Dustin Carl Wurges

EXHIBIT B

LEGAL NAME (LAST, FIRST, MIDDLE) (FIRST PREFERRED NAME (SUFFIX)
**Wurges, Dustin C**

PRINTED DATE: 08/11/2014  GRADUATION DATE: 06/2005

**SCHOOL OF RECORD**

Foss High School
2112 S Tyler St
Tacoma, Wa        98405
(253) 571-7300

DISTRICT IDENTIFICATION / STUDENT NUMBER
1059492

BIRTH DATE
19-FEB-87

PARENT(S) / GUARDIAN(S)
WURGES JR, GARY
WURGES, MICHELLE

SSID
6247 240 851

SCHOOL DISTRICT NAME
TACOMA SCHOOL DISTRICT NO. 10

**GRADE POINT TABLE**

| | | | |
|---|---|---|---|
| A | 4.0 | | |
| A- | 3.7 | | |
| B+ | 3.3 | | |
| B | 3.0 | | |
| B- | 2.7 | | |
| C+ | 2.3 | | |
| C | 2.0 | | |
| C- | 1.7 | | |
| D+ | 1.3 | | |
| D | 1.0 | | |
| E or F | 0.5 | | |

**NOT USED IN GPA**
P/N  Pass/No Pass
CR/NC  Credit/No Credit
I/U  Satisfactory/Unsatisfactory
W  Withdraw

**\*\*\* SCHOOLS ATTENDED \*\*\***

| Entry | Exit | School | City, State |
|---|---|---|---|
| 02/2004 | 07/2005 | Foss High School | Tacoma, Wa |
| 06/2004 | 08/2004 | xSUMMER HIGH SCHOOL | TACOMA, WA |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* ACADEMIC RECORD \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| Course Code | Description | Ltr Grd | Cred Earn | Cred Attp |
|---|---|---|---|---|
| **Mo/Yr: 01/2002 Grd Lev: 09** | | | | |
| OCC | NUTRITION | A- | 0.50 | 0.50 |
| SS-WC | CULTURES 1 | B | 0.50 | 0.50 |
| OCC | MEDIA / VIDEO PROD | B- | 0.50 | 0.50 |
| OCC | pers programming | C | 0.50 | 0.50 |
| SCILAB | INTEGRATED/SCI 9 | C | 0.50 | 0.50 |
| ENG | ENGLISH 9 | C- | 0.50 | 0.50 |
| MTH | ALGEBRA 1 | E | 0.00 | 0.50 |
| FFL | SPANISH 1 | NC | 0.00 | 0.50 |
| **Mo/Yr: 06/2002 Grd Lev: 09** | | | | |
| PPE | WELLNESS 9 | A- | 0.50 | 0.50 |
| HTH | INDIV LIVING | B | 0.50 | 0.50 |
| ENG | ENGLISH 9 | C | 0.50 | 0.50 |
| SS-WC | CULTURES 2 | C | 0.50 | 0.50 |
| SCILAB | INTEGRATED / SCI 9 | D | 0.50 | 0.50 |
| MTH | ALGEBRA 2 | E | 0.00 | 0.50 |
| FFL | SPANISH 2 | NC | 0.00 | 0.50 |
| ZZZ | TEACHER ASSIS | P | 0.50 | 0.50 |
| **Mo/Yr: 01/2003 Grd Lev: 10** | | | | |
| OCC | PERS RELATIONSHIPS | A- | 0.50 | 0.50 |
| PPE | FITNESS / WT TRNG | B | 0.50 | 0.50 |
| FFL | SPANISH 1 | C | 0.50 | 0.50 |
| SCILAB | BIOLOGY | C+ | 0.50 | 0.50 |
| MTH | ALGEBRA 1 | C- | 0.50 | 0.50 |
| HTH | HEALTH | D | 0.50 | 0.50 |
| OCC | CHILD PSYCH | D | 0.50 | 0.50 |
| **Mo/Yr: 06/2003 Grd Lev: 10** | | | | |
| OCC | EXP CHILD | A | 0.50 | 0.50 |
| OCC | CAREERS | A- | 0.50 | 0.50 |
| PPE | FITNESS / WT TRNG | A- | 0.50 | 0.50 |
| SS-WSH | PACIFIC NW HIST | C | 0.50 | 0.50 |
| FFL | SPANISH 2 | D+ | 0.50 | 0.50 |
| MTH | ALGEBRA 2 | E | 0.00 | 0.50 |
| **Mo/Yr: 12/2003 Grd Lev: 11** | | | | |
| FFL | SPANISH 3 | E | 0.00 | 0.50 |
| **Mo/Yr: 01/2004 Grd Lev: 11** | | | | |
| PPE | BASKETBL FITNESS | B | 0.50 | 0.50 |
| PPE | SPORTS MED 1 | C | 0.50 | 0.50 |
| ART | CERAMICS | D | 0.50 | 0.50 |
| ENG | ENGLISH 11 1 | D | 0.50 | 0.50 |
| SCILAB | ANATOMY-PHYSIOL | D | 0.50 | 0.50 |
| MTH | GEOMETRY 1 | E | 0.50 | 0.50 |
| SS-USH | US HISTORY 1 | E | 0.50 | 0.50 |
| ZZZ | ST HALL ODD PER | NC | 0.00 | 0.50 |
| **Mo/Yr: 06/2004 Grd Lev: 11** | | | | |
| PPE702 | PE STUDENT LEADER | A | 0.50 | 0.50 |
| PWS405 | SWIMMING ADVANCED | A | 0.50 | 0.50 |
| HCV401 | CIVICS | A- | 0.50 | 0.50 |
| IWT401 | WOOD TECHNOLOGY 1 | A- | 0.50 | 0.50 |
| HSC400 | ENGLISH/HISTORY A | B | 0.50 | 0.50 |
| LSS400 | SHAKESPEARE SEMINAF | E | 0.50 | 0.50 |
| **Mo/Yr: 08/2004 Grd Lev: 11** | | | | |
| LCL422 | SOPHOMORE ENGLISH 2 | A | 0.50 | 0.50 |
| LEN430 | SOPHOMORE ENGLISH 1 | A | 0.50 | 0.50 |
| **Mo/Yr: 01/2005 Grd Lev: 12** | | | | |
| BOP420 | GENERAL OFFICE SKILLS | B | 0.50 | 0.50 |
| LAN406 | ANNUAL | B | 0.50 | 0.50 |
| IWT401 | WOOD TECHNOLOGY 1 | B+ | 0.50 | 0.50 |
| BBM401 | BUSINESS MATHEMATIC | C | 0.50 | 0.50 |
| MIN421 | INTEGRATED MATH 2A | C | 0.50 | 0.50 |
| LEN630 | SENIOR ENGLISH SURVE | C+ | 0.50 | 0.50 |
| **Mo/Yr: 05/2005 Grd Lev: 12** | | | | |
| PPE700 | ATHLETIC PARTICIPATIO | P | 0.50 | 0.50 |
| **Mo/Yr: 06/2005 Grd Lev: 12** | | | | |
| UCH421 | CONCERT CHOIR B | A | 0.50 | 0.50 |
| HWP401 | WORLD ISSUES | C+ | 0.50 | 0.50 |
| LCL522 | JUNIOR ENGLISH SURVE | C+ | 0.50 | 0.50 |
| MIN422 | INTEGRATED MATH 2B | D | 0.50 | 0.50 |
| YSA590 | PHYSICAL EDUCATION S | D | 0.50 | 0.50 |
| LCL622 | SENIOR ENGLISH SURVE | P | 0.50 | 0.50 |

**\*\*\*\*\*\*\*\*\*\* REPORT PERIOD AND CUMULATIVE SUMMARY \*\*\*\*\*\*\*\*\*\***

| Grd Lev | Mo/Yr | Cred Earn | Cred Attp | GPA Earn | GPA Attp | GPA Pts | GPA |
|---|---|---|---|---|---|---|---|
| 09 | 01/02 | 3.00 | 4.00 | 3.00 | 3.50 | 7.55 | 2.157 |
| 09 | 06/02 | 3.00 | 4.00 | 2.50 | 3.00 | 5.85 | 1.950 |
| 10 | 01/03 | 3.50 | 3.50 | 3.50 | 3.50 | 7.35 | 2.100 |
| 10 | 06/03 | 2.50 | 3.00 | 2.50 | 3.00 | 7.35 | 2.450 |
| 11 | 12/03 | 0.00 | 0.50 | 0.00 | 0.50 | 0.00 | 0.000 |
| 11 | 01/04 | 2.50 | 4.00 | 2.50 | 3.50 | 4.00 | 1.143 |
| 11 | 06/04 | 2.50 | 3.00 | 2.50 | 3.00 | 9.20 | 3.067 |
| 11 | 08/04 | 1.00 | 1.00 | 1.00 | 1.00 | 4.00 | 4.000 |
| 12 | 01/05 | 3.00 | 3.00 | 3.00 | 3.00 | 7.80 | 2.600 |
| 12 | 05/05 | 0.50 | 0.50 | 0.00 | 0.00 | 0.00 | 0.000 |
| 12 | 06/05 | 3.00 | 3.00 | 2.50 | 2.50 | 5.30 | 2.120 |
| **Cumulative:** | | **24.50** | **29.50** | **23.00** | **26.50** | **58.40** | **2.204** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* END OF TRANSCRIPT RECORD \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

For information about the State of Washington High School Transcript, please visit the official website of the Superintendent of Public Instruction. http://www.k12.wa.us

OSPI FORM 1503 (rev. May 2008)

AUTHORIZED SIGNATURE: M. Connell
TITLE: Student Records
DATE: 4/15/24

PAGE 1 of 1

TACOMA SCHOOL DISTRICT #10
OFFICIAL TRANSCRIPT

EXHIBIT C

1

2

3

4     07-1-05243-9   32501761   ORDSMWP   07-24-09

5

6



FILED
DEPT. 10
IN OPEN COURT

JUL 22 2009

Pierce County Clerk
By_____
DEPUTY

7

8

9               SUPERIOR COURT OF WASHINGTON FOR PIERCE COUNTY

10    STATE OF WASHINGTON,

11                              Plaintiff,    CAUSE NO. 07-1-05243-9

                                                                          JUL 2 4 2009
12              vs.
                                              MOTION AND ORDER OF DISMISSAL
      DUSTIN CARL WURGES,                      WITH PREJUDICE
13
                              Defendant.
14

15                                  MOTION

16         Comes now the plaintiff herein, by its attorney, GERALD A. HORNE, Prosecuting

17    Attorney for Pierce County, and moves the court for an order dismissing with prejudice the

18    above entitled action, on the grounds and for the reason that the defendant has complied with the

19    terms and conditions of the Pierce County Drug Court Program, making this case ripe for

20    termination.

21
                                              GERALD A. HORNE
22                                            Pierce County Prosecuting Attorney

23
                                              By: _____
24
                                                ROSEMARIE WILHELM
25                                              Deputy Prosecuting Attorney
                                                WSB # 20180
26

27

28

Office of Prosecuting Attorney
930 Tacoma Avenue S. Room 946
Tacoma, Washington 98402-2171
Telephone: (253) 798-7400

MOTION AND ORDER OF DISMISSAL WITH PREJUDICE - 1
dcdismiss

07-1-05243-9

## ORDER

FILED
DEPT. 10
IN OPEN COURT

JUL 22 2009

Pierce County Clerk
By
DEPUTY

The above entitled matter having come on regularly for hearing on motion of GERALD

A. HORNE, Prosecuting Attorney for Pierce County, and the court being fully advised in the

premises, it is hereby

ORDERED that the above entitled action be and the same is hereby dismissed with

prejudice; bail is hereby exonerated.

DATED this **22** day of July, 2009.

_____
JUDGE

Presented by:

_____
ROSEMARIE WILHELM
Deputy Prosecuting Attorney
WSB# 20180

Approved as to Form:

_____
Karen Lise Silverthorn
Attorney for Defendant
WSB# 27805

jss

Office of Prosecuting Attorney
930 Tacoma Avenue S. Room 946
Tacoma, Washington 98402-2171
Telephone: (253) 798-7400

MOTION AND ORDER OF DISMISSAL WITH PREJUDICE - 2
dcdismiss

EXHIBIT D



# Foss High School
## 04-05 Varsity Football Roster

**Address**
2112 S Tyler St
Tacoma, WA 98405

| # | Name | Pos. | Gr. | Ht. | Wt. |
|---|------|------|-----|-----|-----|
| 1 | Melvin Shobey | RB, DB | Jr. | 5'4" | 120 |
| 2 | Kyrell Bonds | RB, DB | Jr. | 5'10" | 150 |
| 4 | Luke Nedney | QB, LB | So. | 5'5" | 167 |
| 7 | Robert Edwards | QB, DB | Jr. | 6'3" | 183 |
| 8 | Devven Holmes-davenport | QB, DB | Fr. | | |
| 10 | Demetrius Fultz | WR, DB | So. | 5'8" | 136 |
| 11 | Lincoln Mance | WR, LB | Jr. | 5'11" | 168 |
| 12 | Bryce Boschetti | QB, LB | So. | | |
| 14 | Andrew Medina | K, P | Jr. | 6'1" | 175 |
| 16 | John Shrader | WR, DB | Jr. | 5'7" | 142 |
| 17 | James McQueen | QB, LB | Jr. | 5'10" | 150 |
| 21 | Kyle Brown | WR, LB | Jr. | 5'5" | 151 |
| 22 | Harrison Marr | RB, DB | So. | 5'4" | 154 |
| 23 | Bryan Dukes | RB, DB | Sr. | 5'8" | 155 |
| 24 | Dan Chu | RB, LB | So. | 5'6" | 161 |
| 25 | Larry Owens | RB, DL | So. | 5'7" | 153 |
| 26 | Ian Gerald | RB, DB | So. | 5'6" | 161 |
| 27 | Shawn Gross | WR, DB | So. | 5'8" | 145 |
| 30 | Jonathan Burgos | RB, LB | So. | 5'5" | 158 |
| 34 | Bryant Wilkinson | RB, LB | Jr. | 5'9" | 197 |
| 40 | David Means | WR, DB | So. | 5'10" | 145 |

| 42 | William Sheperd | TE, DB | So. | 5'9" | 152 |
| 44 | Cory Brown | RB, DB | Jr. | 5'7" | 145 |
| 45 | Kevin Keal | RB, LB | So. | 5'7" | 179 |
| 52 | Michael Shepard | OL, LB | Jr. | 5'9" | 190 |
| 54 | Ivan Taula | OL, DL | So. | 5'8" | 192 |
| 55 | Ross Faleono | OL, DL | Sr. | 6'2" | 396 |
| 57 | Martez Thompson | OL, DL | So. | 5'8" | 251 |
| 58 | Wurges Dustin | OL, DL | Sr. | 6'2" | 259 |
| 59 | Malcom Williamson | OL, DL | So. | 5'11" | 252 |
| 60 | Anthony Iverson | OL, DL | Jr. | 5'10" | 210 |
| 62 | Doug McCallister | OL, LB | So. | 5'7" | 187 |
| 63 | Jonathan Pedone | OL, DL | Jr. | 5'11" | 175 |
| 64 | Deandre Blackwell | OL, DL | So. | 5'11" | 218 |
| 65 | Sam Gruse | OL, LB | So. | 5'9" | 187 |
| 67 | William Terry | OL, DL | So. | 5'10" | 236 |
| 70 | Eric Bertrand | OL, DL | So. | 6'5" | 244 |
| 72 | Preston Jones | OL, DL | Sr. | 5'11" | 224 |
| 74 | Kris Kupser | OL, DL | Sr. | 5'10" | 196 |
| 77 | Donavan Jones | OL, DL | So. | 5'10" | 182 |
| 78 | Maurice Jackson | OL, DL | Jr. | 5'4" | 258 |
| 79 | Levi Reynolds | OL, DL | Jr. | 6'2" | 268 |
| 81 | Adrian Bravo | TE, DL | Jr. | 6'2" | 185 |
| 82 | Vuong Ngo | WR, DB | So. | 5'7" | 138 |
| 83 | Joseph Chapman | TE, DL | So. | 6'0" | 167 |

| 85 | Jeremy Taraya | WR, DB | So. | 5'8" | 144 |
| 88 | Matt Sherry | TE, DL | Sr. | 6'1" | 181 |
| 97 | Isaac Vanmechelen | TE, DL | Jr. | 6'0" | 180 |
| 99 | Steven Lollis | TE, DL | Jr. | 5'10" | 170 |

| **Staff** | **Position** |
| --- | --- |
| Kareem Razzaq | Head Coach |

POWERED BY 

EXHIBIT E



*David B. Ladenburg*
*Diane M. Ladenburg*

1907

\Your Honor:

My husband David and I have owned rental properties in Pierce County for many years. I write to express our opinion and support of Dustin Wurges for your consideration. Dustin was one of our tenants in an apartment complex located in Puyallup, WA. As a tenant he was always timely with his rent payment and maintained a neat and tidy apartment. Given his pleasant personality and demeanor, we ultimately hired him to perform painting and maintenance around the property. His work ethic, and the quality of the work, was always exemplary. Additionally, we had no concerns entrusting him with the keys to various units while he worked on them. Dustin was always straightforward and proved to be trustworthy. My husband David eventually authorized Dustin to collect rent from several of the tenants whom always insisted on paying in cash.

While we are obviously concerned Dustin is to appear for you on matters we are not informed about, we both hope that you'll consider some of his qualities that may not have been immediately apparent in the proceedings before you. When making your decisions we ask that you take these observation into consideration. Dustin is still a young man and has shown us that he can be a productive member of our community.

Sincerely,

*Diane M. Ladenburg*

M5u/DBL

EXHIBIT F



**MultiCare Health System**
PO Box 5299
Tacoma, WA 98415
253.459.7956
*Printed On: May 9, 2022*

Wurges,Dustin C
4702 S WARNER ST
APT B
TACOMA, WA 98409

**Guarantor ID:** 639081

**Financial Assistance Information**

You may qualify for Financial Assistance. Services provided at MultiCare's urgent/prompt care locations are excluded from MultiCare's Financial Assistance Policy. For a copy of our Financial Assistance policy or to learn about your options, please visit www.multicare.org/financial-assistance/.

**Información de asistencia financiera**

Puede calificar para asistencia financiera. Servicios proporcionado en atención urgente/rápida de MultiCare ubicaciones están excluidas de MultiCare's Financial Política de asistencia. Para obtener una copia de nuestro Financial Política de asistencia o para conocer sus opciones, por favor visita www.multicare.org/financial-assistance/.

Visit Coverages:

**PRIMARY: Coordinated Care Apple Health**
Coordinated Care Apple Health
Subscriber ID: 201226377WA
Group Number:

This is not a bill. This is an itemization of your hospital services for:

| | | | |
|---|---|---|---|
| **Patient:** | Wurges,Dustin C | **Admission Date:** | 05/21/21 |
| **Visit Number:** | 709208581 | **Discharge Date:** | 05/23/21 |
| **Discharge** | GOOD SAMARITAN | | |
| **Location:** | HOSPITAL | | |
| MultiCare Tax ID: 911352172 | | | |

Current Balance for Visit: **$0.00**
**Hospital Charges**

| Service Date | Rev Code | Procedure Code | Description | QTY | AMOUNT | DX Code |
|---|---|---|---|---|---|---|
| 05/21/2021 | 0250 | | 0.9 % NACL SOLN 500 ML FLEX CONT | 50 | 50.00 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |
| 05/21/2021 | 0250 | | ACETAMINOPHEN 325 MG TABS | 2 | 4.00 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |
| 05/21/2021 | 0250 | | ACETAMINOPHEN 325 MG TABS | 2 | 4.00 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |
| 05/21/2021 | 0250 | | HYDROXYZINE PAMOATE 50 MG CAPS | 1 | 3.25 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |
| 05/21/2021 | 0250 | | LIDOCAINE 1 % W/ EPI 1:100,000 1 % SOLN 50 ML VIAL | 50 | 96.80 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |
| 05/21/2021 | 0250 | | LIDOCAINE PRESERVATIVE FREE 2 % (PF) SOLN | 1 | 78.55 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |
| 05/21/2021 | 0250 | | MELOXICAM 15 MG TABS | 1 | 3.45 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |
| 05/21/2021 | 0250 | | OXYCODONE 5 MG TABS | 1 | 25.00 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |
| 05/21/2021 | 0250 | | OXYCODONE 5 MG TABS | 1 | 25.00 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |
| 05/21/2021 | 0250 | | SODIUM CHLORIDE IRRIGATION 0.9 % SOLN | 1 | 40.00 | I87.2I83.92F17.210E66.9Z68.33Z79.899 |

Visit Number: 709208581

*Please refer to this visit number for all inquiries and correspondence. This detail bill reflects charges, payments, and adjustments posted on this date of service.*

| Service Date | Rev Code | Procedure Code | Description | QTY | AMOUNT | Dx Code |
|---|---|---|---|---|---|---|
| 05/21/2021 | 0272 | A4649 | PACK PROCEDURE CLOSURE FAST | 1 | 650.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0278 | C1888 | CATH CF ABLATION 7FRX100CM | 1 | 7,690.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0278 | C1894 | SET INTRODUCER MICRO 7FRX11CM | 1 | 240.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0360 | | C OR-SURG LEVEL 2 ADDL 15 MINUTES | 5 | 10,480.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0360 | | C OR-SURG LEVEL 2 FIRST 15 MINUTES | 1 | 6,988.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0370 | | C ANE-ANESTHESIA LEVEL I-15MIN | 7 | 3,269.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | CEFAZOLIN IN 100 ML D5W 2-4 GM/100ML-% SOLN | 4 | 121.40 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | DEXAMETHASONE 4 MG/ML SOLN | 8 | 75.75 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | FENTANYL 50 MCG/ML (2 ML) SOLN | 2 | 125.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | HYDROMORPHONE 1 MG/ML SOLN | 1 | 125.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | HYDROMORPHONE 1 MG/ML SOLN | 1 | 125.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | HYDROMORPHONE 1 MG/ML SOLN | 1 | 125.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | HYDROMORPHONE 1 MG/ML SOLN | 1 | 125.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | HYDROMORPHONE 2 MG/ML SOLN | 1 | 125.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | LACTATED RINGERS SOLN | 1 | 50.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | MIDAZOLAM 1 MG/ML (2 ML) SOLN | 2 | 125.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | MIDAZOLAM 1 MG/ML (2 ML) SOLN | 1 | 125.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0636 | | PROPOFOL IV (BOLUS) 10 MG/ML EMUL | 20 | 200.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0710 | | C PACU-PHASE 1 RECOV 15 MIN | 7 | 5,747.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/21/2021 | 0710 | | C PACU-PHASE 2 RECOV 15 MIN | 2 | 362.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| 05/23/2021 | 0300 | 36415 | P VENIPUNCTURE | 1 | 42.00 | I87.2I83.92F17.210E66.9Z 68.33Z79.899 |
| | | | **Total Charges** | | **37,245.20** | |

## Hospital Payments and Adjustments

| Date | Description | Amount |
|---|---|---|
| 09/24/21 | Coordinated Care Apple Health Payments | -3,371.64 |
| 09/24/21 | Coordinated Care Apple Health Adjustments | -33,873.56 |
| | **Total Insurance Payments and Adjustments** | **-37,245.20** |

Visit Number: 709208581

*Please refer to this visit number for all inquiries and correspondence. This detail bill reflects charges, payments, and adjustments posted on this date of service.*

EXHIBIT G



# Certificate of Achievement

**This certifies that**

Dustin Wurgts

**has satisfactorily completed**

Health & Nutrition

**Consisting of** 20 **Hours of Training**

**This certificate is hereby issued this** 14th **day of** Oct, 20 22

FDC Slater

EXHIBIT H



# FDC SEATAC
# INMATE BULLETIN

## *Food Service National Menu*

Due to budget constraints, shipping delays, and inflation costs, the national menu will be impacted for at least the next few weeks. We hope to have this resolved by the end of the first week of October 2022. This will likely impact several food items to include: fish, fruit, produce, bread, chicken patties, and beef patties. Menu updates will be provided during the week on TRULINCS. We are working hard to resolve these issues and understand the impact that it will have on the population. We appreciate your patience during this time.

_____          _____
S. Dosanj, Associate Warden                Date
                                           9/15/2022

WURGES, DUSTIN 92510509



# FDC SEATAC
# INMATE BULLETIN

## *National Menu Changes*

This notice is to inform you that changes will be made to
the National Menu due to unforeseen cancellations and
recent shipping issues from numerous vendors for Fish
patties. The changes will affect most weeks throughout the
five-week menu cycle.  The Food Service Department is
making every effort to ensure nutritionally adequate
substitutions are made.  We appreciate your patience and
understanding during this time.

_____
Signature Line

2-13-23
_____
Date

WURGES, DUSTIN 92510509

EXHIBIT I

# Bureau of Prisons
# Psychology Services
# SHU Review

| Inmate Name: | WURGES, DUSTIN CARL | | | | Reg #: | 92510-509 |
|---|---|---|---|---|---|---|
| Date of Birth: | 02/19/1987 | Sex: | M | Facility SET | Unit Team: | DC |
| Date: | 05/24/2023 11:12 | Provider: | Haynick, | PsyD/Chief | | |

| | | | |
|---|---|---|---|
| Placed in SHU: | 05/19/2023 | Type: | SHU |
| Status: | ADMIN.DETENTION | Threat to Self: | Low |
| Basis of Review: | Inmate was interviewed | Adjustment: | Satisfactory, segregation not detrimental |
| Mental Status: | No significant mental health issues. | Threat to Others: | Low |

## Comments

WURGES was seen today for a 30-day SHU Review. WURGES denied any adjustment related to concerns with being housed in SHU. WURGES's appearance, sanitation, and hygiene were adequate. Mood was unremarkable and affect was appropriate and congruent to thought content. WURGES denied experiencing any hallucinations, did not appear to be responding to internal stimuli, and no evidence of delusional beliefs were noted. Current suicidal, self-injurious, or homicidal ideation, plan, or intent was denied. Weekly meetings with unit team, custody, medical, and Executive Staff have revealed no known concerns. In addition, SHU staff report no issues or concerns with WURGES. Overall, WURGES appears to be stable and demonstrates no impairment in functioning at this time. WURGES was informed on how to reach psychology services with any emergent concerns. Therapeutic handouts were offered. WURGES will continue to be seen at least monthly while in SHU and will also be monitored during weekly SHU rounds. WURGES will also be seen for emergent concerns or by referral from staff.

WURGES was offered therapeutic handouts and was aware of Psychology Services Self-Help Books available on the cart in SHU. The SHU Officer assists inmates with this book cart, in addition to the Education Department and Religious Services book carts.

Completed by Haynick, ____ PsyD/Chief Psychologist on 05/25/2023 11:34

# Bureau of Prisons
## Psychology Services
### SHU Review

| | | | | | |
|---|---|---|---|---|---|
| **Inmate Name:** | WURGES, DUSTIN CARL | | | **Reg #:** | 92510-509 |
| **Date of Birth:** | 02/19/1987 | **Sex:** | M | **Facility** SET | **Unit Team:** 4 DETC M |
| **Date:** | 07/20/2023 12:41 | **Provider:** | Haynick, ▆ PsyD/Chief | | |

| | | | |
|---|---|---|---|
| **Placed in SHU:** | 05/19/2023 | **Type:** | SHU |
| **Status:** | ADMIN.DETENTION | **Threat to Self:** | Low |
| **Basis of Review:** | Inmate was interviewed | **Adjustment:** | Satisfactory, segregation not detrimental |
| **Mental Status:** | No significant mental health issues. | **Threat to Others:** | Low |

## Comments

Monthly SHU Review Note

Note: This SHU Review is a brief evaluation of this individual's current mental status in SHU. Although an individual may exhibit adequate adjustment to their SHU confinement and a lack of acute distress at this time, it does not preclude the fact the individual may suffer from a psychological disorder requiring additional psychological services. This SHU Review is also not a risk assessment of an individual's potential for violent behaviors. Rather, it is an assessment of whether the individual exhibits aggressive or violent behaviors at the time of the SHU Review.

WURGES was seen by Psychology Services for a 30-day SHU Review. He reported no significant mental health problems or concerns. SHU Staff were consulted regarding his functioning prior to documenting this 30-Day SHU Review. Further, all individuals housed in SHU were discussed at the weekly SHU Meeting.

If the individual is classified with a Mental Health Care Level Assignment of CARE2-MH and above, it is noted below:

CARE2-MH  [  ]
CARE3-MH  [  ]
CARE4-MH  [  ]

He indicated his adjustment was good. His appearance, sanitation, and hygiene were adequate. His mood was unremarkable and his affect was appropriate and congruent to thought content. WURGES denied experiencing any hallucinations, and no evidence of delusional beliefs was noted. He denied any current suicidal or homicidal ideation, planning, or intent. He was offered therapeutic handouts and declined accepted them. He requested to be considered for MAT and has been added to the referral list.

He was aware of a Psychology Services Self-Help Book Cart in SHU and was able to read these books while in SHU upon request. The SHU Officer assists inmates with this book cart, in addition to the Education Department and Religious Services book carts.

No non-routine psychological intervention is required at this time. WURGES will be seen for a SHU Review in 30 days or less, if still housed in SHU. WURGES will also be seen upon his request or by referral from staff.

Completed by Haynick, ▆ PsyD/Chief Psychologist on 07/21/2023 11:03

# Bureau of Prisons
## Psychology Services
### Turning Point Module Complete

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Inmate Name: | WURGES, DUSTIN CARL | | | | | Reg #: | 92510-509 |
| Date of Birth: | 02/19/1987 | Sex: | M | Facility: | SET | Unit Team: | 4 DETC M |
| Date: | 08/14/2023 12:34 | Provider: | Baer, ▮ Psych Tech | | | | |

## Name of Module

Mr. Wurges turned in compelted Turning Point "Caring." His work is attached.

Completed by Baer, ▮ Psych Tech on 08/14/2023 12:36

# Bureau of Prisons
## Psychology Services
### MAT Clinical Note

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Inmate Name: | WURGES, DUSTIN CARL | | | | | Reg #: | 92510-509 |
| Date of Birth: | 02/19/1987 | Sex: | M | Facility: | SET | Unit Team: | 4 DETC M |
| Date: | 10/25/2023 13:56 | Provider: | Demontigny, ███ MA/DTS | | | | |

## Comments

I met with Mr. Wurges to do a staff clinical check based on a "Request to Staff" in reference to his desire to be placed in the Medical Assisted Treatment (MAT) program.

A portion of his request to staff read as follows: "I need assistance BAD!!! please refer me to the MAT program. Please come and speak to me immediately because I feel I am losing control. I am serious problems concentrating, I can't fall asleep because it's starting to become all i think about and I don't want to backslide."

As a result, I went to Mr. Wurges unit and cell and talked with him. Mr. Wurges was not in acute state, he was calm and rational for the entire interaction. He appeared healthy and coherent. I told him about his current status of being placed in the MAT program and he told me that he appreciated the update. I discussed some of the concerns he mentioned in his request to staff, and he verbally acknowledged frustrations over the time it was taking him but not in a place where he would use illicit substances. I let him know that his evaluation was completed by psychology and further review was needed by the Medical Department. He was calm and let me know he understood the situation. I advised him to be patient and he agreed. I left interaction, Mr. Wurges seemed calm, though eager to get into MAT. He appeared to understand that it was in his best interest to continue to work with staff to work toward his admittance into the MAT program.

Completed by Demontigny, ███ MA/DTS on 10/25/2023 14:14

# Bureau of Prisons
## Health Services
## See Amendment

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | WURGES, DUSTIN CARL | | | Reg #: | 92510-509 |
| Date of Birth: | 02/19/1987 | Sex: | M | Race: | WHITE |
| Encounter Date: | 10/25/2023 13:56 | | | Facility: | SET |

**Amendment made to this note by Demontigny, ▆▆ MA/DTS on 10/25/2023 14:14.**

# Bureau of Prisons
## Psychology Services
### MAT Clinical Note

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | WURGES, DUSTIN CARL | | | | Reg #: | 92510-509 |
| Date of Birth: | 02/19/1987 | Sex: | M | Facility: SET | Unit Team: | 4 DETC M |
| Date: | 01/02/2024 11:14 | Provider: | Haynick, ▓▓ PsyD/Chief | | | |

## Comments

Mr. Wurges was seen and noted he is doing well on MAT with no current related concerns. He requested a copy of his psychology records, which will be provided. He did not appear to be in acute distress and did not report any suicidal, homicidal, or self-injurious ideation, plan, or intent. Mental status was within normal limits and unremarkable. He presented as calm and polite. He was reminded of how to contact psychology services with any emergent concerns.

Completed by Haynick, ▓▓ PsyD/Chief Psychologist on 01/29/2024 11:20

# Bureau of Prisons
## Psychology Services
### Diagnostic and Care Level Formulation

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | WURGES, DUSTIN CARL | | | | Reg #: | 92510-509 |
| Date of Birth: | 02/19/1987 | Sex: | M | Facility: SET | Unit Team: | 4 DETC M |
| Date: | 01/29/2024 11:40 | Provider: | Haynick, ▓ PsyD/Chief | | | |

## Relevant Historical Information

Mr. Wurges reported a history of using cannabis and alcohol at age 12-15. At age 14, he reportedly began using cocaine and ecstasy on occasion. He noted he had back surgery in 2013 and was prescribed OxyContin, Dilaudid, Percocet, and then started using heroin in 2014. He reported using fentanyl in 2021 and noted he has not used since his incarceration at this facility. He reported a history of driving while under the influence though has no history of DUIs. He reported a history of experiencing withdrawal symptoms to include bone pain, pins and needles feeling, GI distress, cold sweats, and night terrors.

He reportedly attended a state mandated drug treatment program; however, did not complete it due to COVID restrictions. He reported he was prescribed MAT in 2020 until the time of his arrest, to include suboxone as well as methadone.

He denied any history of mental health diagnosis, symptoms, or treatment. He denied any history of suicide or self-injury ideation, plan, or intent.

## Presenting Problem/Symptom

Mr. Wurges was seen for a MAT screening.

## Diagnostic Formulation

Mr. Wurges has satisfied the following DSM 5 criteria for use of opioids:

____ Activities: Important social, recreational, or occupational activities given up or reduced because of use.
_x__ Time Spent: Inmate indicated a great deal of time would be spent in activities necessary to obtain, use, or recover from the effects of this substance.
_x__ Responsibilities: Inmate reported recurrent use that resulted in a failure to fulfill major role obligations at work, school or home.
__x_ Excessive Use: Inmate reported taking larger amounts or over a longer period than was intended.
__x__ Desire to quit: Inmate acknowledged a desire to quit using at the time and was never able to control, cut down on, or stop use.
_x__ Craving: Inmate endorsed experiencing cravings or a strong desire or urge to use.
_x__ Withdrawal: Inmate endorsed experiencing characteristic withdrawal syndrome or needing to use substance to avoid or relieve withdrawal symptoms.
__x_ Continued Use: Inmate endorsed continued use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance.
_x___ Recurrent use in situations in which it is physically hazardous.
_____ Continued use despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by substance.
__x_· Reported symptoms of tolerance

## Care Level Formulation

Given the above information, to include the absence of SMI diagnosis, symptoms, or treatment, as well as his ability to function independently, Mr. Wurges will retain a CARE1-MH classification at this time.

## Diagnosis:

Opioid Use Disorder: Severe, F11.20*b - Current - *in a controlled environment*

Completed by Haynick, ▓ PsyD/Chief Psychologist on 01/29/2024 11:48

# Bureau of Prisons
# Psychology Services
# MAT Screening Summary

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | WURGES, DUSTIN CARL | | | Reg #: | 92510-509 |
| Date of Birth: | 02/19/1987 | Sex: | M | Facility: SET | Unit Team: 4 DETC M |
| Date: | 09/12/2023 08:12 | Provider: | Haynick, ▓ PsyD/Chief | | |

## Substance Use History

Mr. Wurges reported a history of using cannabis and alcohol at age 12-15. At age 14, he reportedly began using cocaine and ecstasy on occasion. He noted he had back surgery in 2013 and was prescribed OxyContin, Dilaudid, Percocet, and then started using heroin in 2014. He reported using fentanyl in 2021 and noted he has not used since his incarceration at this facility. He reported a history of driving while under the influence though has no history of DUIs. He reported a history of experiencing withdrawal symptoms to include bone pain, pins and needles feeling, GI distress, cold sweats, and night terrors.

## History of Drug Treatment

He reportedly attended a state mandated drug treatment program; however, did not complete it due to COVID restrictions. He reported he was prescribed MAT in 2020 until the time of his arrest, to include suboxone as well as methadone.

## Mental Health History

He denied any history of mental health diagnosis, symptoms, or treatment. He denied any history of suicide or self-injury ideation, plan, or intent. Mental status was within normal limits and unremarkable. While housed in SHU, he has requested Turning Point handouts to complete routinely during weekly rounds, and has turned in the completed packets as well.

## Recommendation

He reported a history of substance use including regular use of opioids and experiencing symptoms of withdrawal. He also reported a history of enrollment in MAT. He denied any recent history of experiencing suicidal or self-injurious ideation, plan, or intent, and remained future focused as well as motivated towards treatment. Given the available information, at this time with regards to this psychology screening there does not appear to be any current contraindications to MAT. The appropriate medical staff have been notified of this information. He was offered therapeutic handouts.

Completed by Haynick, ▓ PsyD/Chief Psychologist on 01/29/2024 11:50

# Bureau of Prisons
# Psychology Services
# Group Participation

| | | | | | |
|---|---|---|---|---|---|
| **Inmate Name:** | WURGES, DUSTIN | | | **Reg #:** | 92510-509 |
| **Date of Birth:** | 02/19/1987 | **Sex:** M | **Facilitator:** | (P)Haynick, ▮▮ PsyD/Chief Psychologist | |
| **Date:** | 08/09/2023 | **Group Facility:** SET | **Group Title:** | [230] MAT Group DB | |

| | |
|---|---|
| **Status:** | Enrolled |
| **Enroll Date:** | 11/20/2023 **End Date:** |
| **Total Hours:** | 1.0 |

## SESSION DATA:

**Number of Sessions:** 1    **First Session Date:** 11/29/2023    **Last Session Date:** 11/29/2023

| Date | Title | Duration | Attendance | Participation | |
|---|---|---|---|---|---|
| 11/29/2023 | Session #4: Keeping a calendar Part #2 | 60 | Complete Session | Good | Satisfactory |

| **Attendance** | | **Participation** | |
|---|---|---|---|
| Complete Session Present | 100.0 % | Good | 100.0 % |
| Incomplete Session Excused | 0.0 % | Fair | 0.0 % |
| Incomplete Session Not Excused | 0.0 % | Poor | 0.0 % |
| Absent Excused | 0.0 % | Not Apply | 0.0 % |
| Absent Not Excused | 0.0 % | | |

EXHIBIT J



December 16, 2022

MEMORANDUM FOR ALL FEDERAL PROSECUTORS

FROM:        THE ATTORNEY GENERAL

SUBJECT:      ADDITIONAL DEPARTMENT POLICIES REGARDING
                     CHARGING, PLEAS, AND SENTENCING IN DRUG CASES

General Department policies regarding charging an offense, entering into a plea agreement, and making sentencing recommendations are set forth in *General Department Policies Regarding Charging, Pleas, and Sentencing* (2022) (hereinafter "General Policies Memorandum"). This memorandum provides additional, specific policies regarding charging, pleas, and sentencing in drug cases -- consistent with the priority the Department has placed on focusing its prosecutorial resources on combatting violent crime.

## <u>CHARGING DOCUMENTS AND PLEA AGREEMENTS</u>

### Mandatory Minimum Offenses

As stated in the General Policies Memorandum, "charges that subject a defendant to a mandatory minimum sentence should ordinarily be reserved for instances in which the remaining charges … would not sufficiently reflect the seriousness of the defendant's criminal conduct, danger to the community, harm to victims" and "such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation." General Policies Memorandum at 2, 3.

This policy applies with particular force in drug cases brought under Title 21 of the United States Code, where mandatory minimum sentences based on drug type and quantity have resulted in disproportionately severe sentences for certain defendants and perceived and actual racial disparities in the criminal justice system. *See* Governor Asa Hutchinson, Statement before the Senate Judiciary Committee 2 (June 22, 2021); Attorney General Holder, *Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases* (2013); United States Sentencing Commission, *Mandatory Minimum Penalties for Drug Offenses in the Federal Criminal Justice System* 8, 26, 57 (Oct. 2017). Accordingly, in cases in which Title 21 mandatory minimum sentences are applicable based on drug type and quantity, prosecutors should decline to charge the quantity necessary to trigger a mandatory minimum sentence if the defendant satisfies all of the following criteria:

- The defendant's relevant conduct does not involve: the use of violence, the direction to another to use violence, the credible threat of violence, the possession of a weapon, the trafficking of drugs to or with minors, or the death or serious bodily injury of any person;
- The defendant does not have a significant managerial role in the trafficking of significant quantities of drugs;
- The defendant does not have significant ties to a large-scale criminal organization or cartel, or to a violent gang; and
- The defendant does not have a significant history of criminal activity that involved the use or threat of violence, personal involvement on multiple occasions in the distribution of significant quantities of illegal drugs, or possession of illegal firearms.

In making the above assessment, prosecutors should consider whether the above criteria are satisfied without regard to whether the defendant would be eligible for a sentence below a mandatory minimum term based on application of the safety valve, 18 U.S.C. § 3553(f), or on substantial assistance under 18 U.S.C. § 3553(e).

In cases in which prosecutors determine that some but not all of the criteria are satisfied, prosecutors should not automatically charge the quantity necessary to trigger the mandatory minimum, but rather weigh the considerations set forth in this memorandum and the General Policies Memorandum to carefully determine, through the exercise of their discretion and in consultation with their supervisors, whether a Title 21 charge with a mandatory minimum sentence is appropriate.[1]

As set forth in the General Policies Memorandum, any decision to include a mandatory minimum charge in a charging document or plea agreement must be approved by a supervisory attorney as designated by the United States Attorney or Assistant Attorney General for the relevant litigating division.

If information sufficient to determine that all of the criteria above are satisfied is available at the time initial charges are filed, prosecutors should decline to pursue Title 21 charges triggering a mandatory minimum sentence. If this information is not yet available, prosecutors may file charges involving these mandatory minimum statutes pending further information. If information that the criteria are satisfied is subsequently obtained, prosecutors should pursue a disposition that does not require a Title 21 mandatory minimum sentence. For example, a prosecutor could ask the grand jury to supersede the indictment with charges that do not carry mandatory minimum sentences; a defendant could plead guilty to a lesser included offense that does not carry the mandatory minimum; or a defendant could waive indictment and plead guilty to an information that does not charge the quantity necessary to trigger the mandatory minimum.

---

[1] For example, in a case involving a defendant who serves only as a "drug mule," but who arguably does not satisfy all of the criteria discussed above, the balance of considerations may still weigh against the filing of a Title 21 charge carrying a mandatory minimum sentence.

**Recidivist Enhancements**

In deciding whether to file an information under 21 U.S.C. § 851 requiring imposition of enhanced statutory penalties, prosecutors in drug cases should be guided by the same criteria discussed above for charging mandatory minimum offenses, as well as whether the filing would create a significant and unwarranted sentencing disparity with equally or more culpable co-defendants.  Prosecutors are encouraged to make the Section 851 determination, and to file any such a notice, at the time the case is charged or as soon as possible thereafter.

As with any filing, a Section 851 enhancement should not be filed simply to exert leverage to induce a plea or because the defendant elected to exercise the right to trial.  General Policies Memorandum at 3.

## SENTENCING RECOMMENDATIONS

The General Policies Memorandum advises that, although in many cases the appropriate balance among the 18 U.S.C. § 3553(a) factors will lead to a recommendation for a sentence within the advisory range resulting from the application of the Sentencing Guidelines, there are cases in which such a sentence may not be "proportional to the seriousness of the defendant's conduct" or "achieve the purposes of criminal sentencing as articulated in 18 U.S.C. § 3553(a)." General Policies Memorandum at 5.  In such cases, prosecutors may conclude that a request for a departure or variance above or below the guidelines range is warranted.  *Id.*

In the context of drug cases, requests for departures or variances may be particularly justified in the following circumstances:

- **Certain cases in which the guidelines range does not adequately reflect the defendant's crime and culpability**:  At times, a low-level seller in a large-scale drug organization may be held responsible under the relevant conduct provisions of the Sentencing Guidelines for a large quantity of drugs that produces an advisory range near the top of the sentencing table.  In such cases, prosecutors should consider supporting a downward departure or variance, particularly where all or most of the criteria listed on the first two pages of this memorandum are satisfied.  Conversely, where the criteria are satisfied and yet the penalty yielded by the advisory guidelines range is not proportional to the seriousness of the defendant's conduct, prosecutors may consider seeking an upward departure or variance.

- **Certain cases in which the career offender guidelines range does not adequately reflect the defendant's crime and culpability:**  Similar consideration should be given in a case in which the defendant is subject to sentencing under the career offender guideline, *see* U.S.S.G. § 4B1.1, which is designed to trigger guideline ranges at or near statutory maximum sentences.  In a case in which all or most of the listed criteria are present, and the defendant's status as a career offender is predicated only on the current and previous commission of nonviolent controlled substance offenses, prosecutors should consider

supporting a downward variance to the guidelines range that would apply in the absence of career offender status.[2]  (For purposes of this memorandum, nonviolent offenses are those that do not involve the actual or threatened use of a weapon or other means of violence.)  Conversely, if the defendant's prior convictions involved the actual or threatened use of violence, but the crimes do not qualify as career offender predicates under the "categorical approach," if appropriate prosecutors may consider advocating for an upward variance, including toward the career offender range.

Whatever the ultimate sentencing recommendation, prosecutors must always be candid with the court, the probation office, and the public as to the full extent of the defendant's conduct and culpability, including the type and quantity of drugs involved in the offense and the quantity attributable to the defendant's role in the offense, even if the charging document lacks such specificity.

### CHARGING, PLEAS, AND SENTENCING IN CRACK COCAINE CASES

The Justice Department supports elimination of the crack-to-powder sentencing disparity and has testified before Congress in support of the EQUAL Act, S. 79, which would remove that disparity.  As the Department has explained:  "First, the crack/powder disparity is simply not supported by science, as there are no significant pharmacological differences between the drugs: they are two forms of the same drug, with powder readily convertible into crack cocaine. Second, as documented by the Sentencing Commission, the crack/powder sentencing differential is still responsible for unwarranted racial disparities in sentencing.  Third, the higher penalties for crack cocaine offenses are not necessary to achieve (and actually undermine) our law enforcement priorities, as there are other tools more appropriately tailored to that end." Justice Department Statement, Senate Judiciary Committee 6 (June 22, 2021).[3]

Accordingly, prosecutors in crack cocaine cases should take the following steps to promote the equivalent treatment of crack and powder cocaine offenses.

---

[2] The Sentencing Commission has documented the increasing frequency of sentencing variances below a career offender range, particularly for those whose career offender status rested on drug offenses rather than violent crimes. The Commission reported that, by fiscal year 2014, judges imposed a sentence below the career offender range in roughly 75% of drug-based career offender cases, frequently choosing a sentence close to the non-career offender drug guideline. United States Sentencing Commission, *Report to the Congress: Career Offender Enhancements* 35 (2016).

[3] *See* Testimony of Acting ONDCP Director, Senate Judiciary Committee, June 22, 2021; U.S. Sentencing Commission Report 1995 (recommending sentencing guidelines amendment that would have equalized the guidelines penalties for powder and crack cocaine offenses based solely on drug quantities).

If charging a mandatory minimum term of imprisonment under Title 21 for a drug offense involving crack cocaine is deemed warranted under this memorandum, prosecutors should charge the pertinent statutory quantities that apply to powder cocaine offenses. The Criminal Division and the Executive Office for United States Attorneys will issue further guidance on how to structure such charges.

At sentencing, prosecutors should advocate for a sentence consistent with the guidelines for powder cocaine rather than crack cocaine. Where a court concludes that the crack cocaine guidelines apply, prosecutors should generally support a variance to the guidelines range that would apply to the comparable quantity of powder cocaine.

As noted above, prosecutors must always be candid with the court, the probation office, and the public as to the full extent of the defendant's conduct and culpability, including the type and quantity of drugs involved in the offense, even if the charging document lacks such specificity.[4]

---

[4] The policies contained in this memorandum, and internal office procedures adopted pursuant thereto, are intended solely for the guidance of attorneys for the government. They are not intended to create a substantive or procedural right or benefit, enforceable at law, and may not be relied upon by a party to litigation with the United States. Justice Manual § 9-27.150 (updated Feb. 2018); *see United States v. Caceres*, 440 U.S. 741 (1979).

EXHIBIT K

**COMMUNITY CUSTODY HEARING PREPARATION SHEET**

| | | | |
|---|---|---|---|
| Date and Time: | **11/16/2021 10:30 AM** | Assigned CCO: | **Hailey Wells** |
| Hearing Type: | **Full Hearing** | Office Location: | **Tacoma Unit 1 Office** |
| Hearing Location: | **Thurston County Jail** | Telephone: | **(253)680-2623** |

### *OFFENDER INFORMATION*

| | | | |
|---|---|---|---|
| Offender: | **WURGES, Dustin C.** | DOC#: | **407160** |
| DOB: | **02/19/1987** | RLC: | **LOW** |
| SRD: | | | |

### *CAUSE INFORMATION:*

| | | |
|---|---|---|
| Cause: Pierce AA-171026311 **(CCP-DOSA)** | | Stat Max Date: 02/18/2028 |
| Available DOSA Days per OMNI: See Comments | CTC Credits: | Adjusted Available DOSA Days: |
| Crime(s): Residential Burglary<br>Theft of a Firearm<br>Theft of Motor Vehicle | | Underlying 21: No |

| | | |
|---|---|---|
| Cause: Pierce AC-171030025 **(CCP-DOSA)** | | Stat Max Date: 02/17/2023 |
| Available DOSA Days per OMNI: See Comments | CTC Credits: | Adjusted Available DOSA Days: |
| Crime(s): Identity Theft 2<br>Identity Theft 2<br>Identity Theft 2<br>Identity Theft 2 | | Underlying 21: No |

| | | |
|---|---|---|
| Cause: Pierce AF-171030866 **(CCP-DOSA)** | | Stat Max Date: 08/14/2027 |
| Available DOSA Days per OMNI: See Comments | CTC Credits: | Adjusted Available DOSA Days: |
| Crime(s): Residential Burglary<br>Theft of a Firearm<br>Theft of a Firearm<br>Theft of a Firearm<br>Theft of a Firearm<br>Theft of a Firearm | | Underlying 21: No |

### *CONSECUTIVE SENTENCES PENDING:*

### *ARREST INFORMATION:*

| | | | |
|---|---|---|---|
| Arrest Date: | 11/08/2021 | County of Arrest: | Thurston |
| Warrant Date: | 10/19/2021 | Days on FTR/Abscond: | 20 |
| Comments: | Cause AA has approx. 728 days of revoke time//Cause AC has approx. 129 days of revoke time// Cause AF has approx. 728 revoke days // Cause AA, AC, AF have 30+ days to SED | | |

### *VIOLATION HISTORY:*

Period of Supervision Start Date: 04/12/2018

| Level of Response: | Seriousness Level: | Response Date: | Sanction: |
|---|---|---|---|
| Swift and Certain Stipulated Agreement | Low | 07/06/2021 | Comp Eval & follow recomm Subst Use Disorder Trmt/20 days |

| | | |
|---|---|---|
| **Prior Hearings: 0** | **Prior Negotiated Sanctions: 0** | **Prior Stipulations: 0** |
| **Prior SAC Hearings: 0** | **Prior SAC Negotiated Sanctions: 0** | **Prior SAC Stipulations: 1** |
| | **Prior SAC Low Level: 0** | |

### *OTHER INFORMATION:*

## Field Offender: WURGES, Dustin Carl (407160)

| Gender: Male | DOB: 02/19/1987 | Age: 34 | Body Status: Failure To Report |
| --- | --- | --- | --- |
| RLC: LOW | Wrap-Around: No | Comm. Concern: No | Location: Tacoma Unit 1 Office |
| SED: Tolling | | | CC/CCO: Wells, Halley C (TP24) |
| | County SO Lvl: | ESR SO Lvl: | |
| ORCS: Unknown | | | |

### Details

**Date & Time Created:** 11/09/2021 06:49 AM
**Offender Location At Occurrence:** Not Unique
**Date & Time Of Occurrence:** 11/09/2021
**DOC No.:** 407160
**Offender Name:** WURGES, Dustin Carl
**Author Name:** Poston, Michael A
**Events:** Arrest ( AR )

### Text

SW CRU, Thurston county Sheriff and a few other agencies arrested p for his DOC warrant after he returned from California with DOC offender Jonathan Mayhall 879801 in which he picked up numerus pounds of narcotics. mayhall and p stopped the vehicle at a rest area on I-5 to conduct a narcotics transaction. officers and agents moved in and arrested p, DOC offender mayhall, and closed doc offender kaelin usey 348613. inside the vehicle was an open box containing numerus pounds of Meth, Heroin, and fentanyl pills. p admitted to a gun being in the vehicle and obtaining narcotics for distribution. Usey had a gun in her purse. Wurges, Mayhall, usey were booked into the Thurston county jail for new felony charges. the vehicle was taken for a search warrant.

---

**Date & Time Created:** 11/08/2021 04:09 PM
**Offender Location At Occurrence:** Not Unique
**Date & Time Of Occurrence:** 11/08/2021 04:09 PM
**DOC No.:** 407160
**Offender Name:** WURGES, Dustin Carl
**Author Name:** Lovell, Thomas C
**Events:** Violator Arrest ( AV )

Booking Location: Thurston Co. Violator Facility

---

**Date & Time Created:** 10/26/2021 10:51 AM
**Offender Location At Occurrence:** Not Unique
**Date & Time Of Occurrence:** 10/26/2021
**DOC No.:** 407160
**Offender Name:** WURGES, Dustin Carl
**Author Name:** Tran, Kim
**Events:** Telephone Collateral ( TC )

received a call from p's cd counselor Sarah from NW Integrated (253-300-7472) sgaston@NWIH.org. she informed me that p came in to see her yesterday and admitted to her that he had relapsed. she told p he needed to turn himself in to DOC. I told C if p turns himself in he is eligible for low level sanction. C stated p continues to come in to see her and is in compliance with them. C stated she will try to call p and have him report.

---

**Date & Time Created:** 10/20/2021 09:55 AM
**Offender Location At Occurrence:** Not Unique
**Date & Time Of Occurrence:** 10/20/2021
**DOC No.:** 407160
**Offender Name:** WURGES, Dustin Carl
**Author Name:** Sieg, Michael J
**Events:** Warrant ( WN )

**WPER** WARRANT DATED 10/19/21 ENTERED INTO WACIC/NCIC.

---

**Date & Time Created:** 10/19/2021 04:48 PM
**Offender Location At Occurrence:** Not Unique
**Date & Time Of Occurrence:** 10/19/2021
**DOC No.:** 407160
**Offender Name:** WURGES, Dustin Carl
**Author Name:** Tran, Kim
**Events:** Comment ( CM )

p failed to report today as directed. attempted to call p but no answer. p's girlfriend has been unable to get a hold of p as well. warrant requested. p does have a valid address, but due to current office issue, no 5 day will be conducted.

---

**Date & Time Created:** 10/19/2021 02:27 PM
**Offender Location At Occurrence:** Not Unique
**Date & Time Of Occurrence:** 10/19/2021

p's girlfriend ironically called me right after I left a voicemail with p. C stated she knows p was scheduled to report to me. C claimed that p had to go to the hospital this morning but didn't say why and didn't know

| Details | Text |
|---|---|
| DOC No.: 407160<br>Offender Name: WURGES, Dustin Carl<br>Author Name: Tran, Kim<br>Events: Telephone Collateral (-TC-) | what hospital he is at or if he is still there. C stated she texted p but he hasn't replied to her either. C stated she will find out where p is and call me back. told C that if p fails to report by end of day, I will be requesting a warrant. C stated she understood. |
| Date & Time Created: 10/19/2021 02:25 PM<br>Offender Location At Occurrence: Not Unique<br>Date & Time Of Occurrence: 10/19/2021<br>DOC No.: 407160<br>Offender Name: WURGES, Dustin Carl<br>Author Name: Tran, Kim<br>Events: Telephone No Contact ( TN ) | attempted to call p this date to remind him to report today. phone rang with no answer and I was unable to leave a voicemail. |
| Date & Time Created: 08/17/2021 10:04 AM<br>Offender Location At Occurrence: Not Unique<br>Date & Time Of Occurrence: 08/17/2021 10:00 AM<br>DOC No.: 407160<br>Offender Name: WURGES, Dustin Carl<br>Author Name: Tran, Kim<br>Events: Contact ( CN ) | p reported as directed and submitted a 7 panel UA which was negative for all substances. p stated he has surgery on his leg this week and should be off work for a week. p voiced no issues or any new law violations to address. p has completed all tx requirements for his DOSA but does attend methadone and AA/NA meetings. NRD 09/21 |

P-26328
000036

EXHIBIT L

NORTHWEST INTEGRATED HEALTH LAKEWOOD
3727 South Tacoma Way
Lakewood, WA 98409
P. 253-300-7474
F. 253-212-0724



01/03/2022

**To whom it may concern**
Dustin Wurges DOB 02/19/1987 is an enrolled patient at NWIH for
Medication Assisted Treatment (MAT). He received Outpatient
counseling from our facility. He has not been discharged from our
services during his incarceration. He is eligible to return to our clinic
upon release for reevaluation by counseling and medical for
appropriate needs regarding his MAT options. At the time of his arrest
he was actively engaged in services at NWIH.

Heather Asbell Clinical Supervisor
Northwest Integrated Health SW Tacoma
Phone: 253-300-7474
Email: heaasb@nwih.com

This information has been disclosed to you from records whose confidentiality is protected by federal law (42 CFR, Part2).
Federal regulation prohibits you from making any further disclosure of this material without the specific written consent of the
person to whom it pertains, or as otherwise permitted by this regulation.  A general authorization for the release of medical or
other information is not sufficient for this purpose.

EXHIBIT M

To whom it may concern:


My name is Jaquan Jackson, and I am writing this letter today, on behalf of a very close friend of mine Dustin Wurges.

I am currently staying in Seattle Washington; I am a full time single father to an 11 year old girl who lives in my home. I work as a youth advocate and community outreach specialist with at risk youth with an organization called Dare2aBe Project. The Dare2Be Project is a community action agency, focused on interrupting the cycle of poverty by leveraging high-quality youth development programs in combination with a wide range of supportive services.  These services are designed to improve the social-emotional well-being and economic status of the adults that influence and take care of our community's most precious resource, youth.

I met Dustin in Tacoma Washington through mutual friends of ours almost 10 years ago and ever since we met he's forever left a lasting imprint on my life, he's such a great father and motivates me to be a better father/man myself, his children mean the world to him and he has sacrificed so much to be a part of their lives, he is one of the most selfless people I have met in my life and has always had a very big heart and cared about his loved ones enough to give his last knowing they would get through whatever it was they needed help with, he is a very approachable person in the community and a great family man your honor. Our children have known each other for some years now and get along just well sort of like siblings or cousins if you ask me. Dustin has always volunteered to help the less fortunate out of the kindness of his heart and has done countless acts of service for his community without looking for anything in return. He has inspired me in rough times of my life that I went through obstacles and situations that presented themselves to be great challenging moments and I didn't know where else to turn. Dustin has shown so much remorse and accepted responsibility with the choices he has made that has brought him to his current situation and he continuously shows acknowledgement but not only that but so much growth in his new journey to become a better man, Dustin's absence has affected us all especially his children and family. I could write a whole book on how amazing a man he is, but I just want to leave this letter by saying Dustin is so much better than his worse mistakes your honor.

It is in my sincere hope the court takes this letter into consideration at the time of sentencing, despite the current case, I still believe Dustin Wurges to be an honorable individual, a valuable member of my community, and a good human being.


Jaquan Jackson

(206) 530-1095

jaquanjackson4424@gmail.com

EXHIBIT N

To whom it may concern,

I'm writing this not as just a supporter for Dustin but for his daughter who I know needs him to get his life back on track. My name is Eric Patterson I've known and been associated with Dustin since first playing football with him in 6th grade when we were 12. Dustin was and is when his head is right and centered around the right people and following good people a good spirited and good-hearted person. He was my lineman as I was his quarterback, and his job was to protect me as he did to the best of his abilities. I'm a very introverted person who has a very small circle of people in my life. I'm a father of 5 and a married thru Christ for 2 years now. I am a Christian man that only fears God and failing one's family. I've grown up as a community leader and been heavily involved in helping try to curve Tacoma's negative homeless crisis. I say that as relevance because when Dustin got out, I want to say I mentored him into being a business owner and using his light to shine and bless others and he took that guidance and was doing phenomenally. I have never had any addiction issues in my life so I can't attest to that struggle, but I saw the change in him and instead of an intervention I distanced myself when he truly needed me the most. The man who was all about his start up business and his daughter and rebuilding his relationship with his parents and growing in his relationship with his fiancée was quickly getting consumed by his old demons he was truly trying to run from. Dustin in a path of sobriety and Christ is a man who could inspire the world and lead men in a positive light. I've seen it for myself he needs our help now more than ever and I just wish I was given another opportunity to be that mentor because in this world where I lost a brother to substance abuse already, I wasn't prepared to fight for Dustin. I do not drink or use any substances. I know what he has done was detrimental to himself and could have potentially harmed others but God had other plans to not let that happen and I'm hoping we can get a plan to not only see Dustin through this time but have it set up that when he is released he is hitting the ground running and shooting for the stars and the next solar eclipse is of Dustin shooting for all he can truly achieve in this world. He has a beautiful heart; he truly is a kind soul that just needs the right people and structure around him, and he can truly accomplish anything he puts his mind to. Dustin has allot to offer I had vision of us really doing big things in this community. I sincerely hope that all this information is taken into consideration when judging the character of Dustin. He can and will be great and even better than before if given the opportunity.


Eric Patterson
(253) 527-2426
epatterson253@gmail.com